**Fidel RAMOS, et al., Plaintiffs,**

v.

**Richard D. LAMM, et al., Defendants.**

**Civ. A. No. 77–K–1093.**

United States District Court,
D. Colorado.

March 27, 1986.

As Amended April 8, 1986.

Edwin S. Kahn, Kelly, Haglund, Garnsey & Kahn, Denver, Colo., for plaintiffs.

John D. Dailey, Asst. Atty. Gen., Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

This case is now before me for final determination of attorney fees and costs. The facts of this case have been previously set forth in detail in other decisions, *see, e.g., Ramos v. Lamm*, 485 F.Supp. 122 (D.Colo.1979), *aff'd in part, vacated in part, and remanded*, 639 F.2d 559 (10th

Cir.1980). The bottom line is an order for defendants to pay plaintiffs attorney fees and costs in the amount of $871,920.97. My findings and conclusions follow.

## I. BACKGROUND

In this civil rights action against officials of the State of Colorado, plaintiffs sought to remedy various constitutional violations at the maximum security unit of the Colorado State Penitentiary located in Canon City, Colorado. In 1979, after a lengthy trial, I ruled that the conditions of confinement at the penitentiary were unconstitutional. *Ramos*, 485 F.Supp. 122, 169. I also ordered that the facility be closed but deferred implementation of that order on the condition that the state present plans for eradication of the constitutional violations. *Ramos*, 485 F.Supp. 122, 169–70.

With respect to specific constitutional violations I found (1) the physical facilities were grossly inadequate; (2) the lack of safety deprived prisoners of one right and prevented the fulfillment of others; (3) idleness and lockdown made degeneration likely and self-improvement impossible; (4) the failure to provide adequate medical care evidenced a deliberate indifference to serious health needs; (5) the classification system was irrational; (6) limitations on visitation were unconstitutional; (7) limitations on correspondence were unconstitutional and (8) denial of adequate access to the courts was unconstitutional.

On appeal defendants challenged the foregoing specific rulings as well as my earlier declination to abstain and my order to close the facility subject to defendants presenting plans to eradicate the constitutional violations.

The Court of Appeals affirmed my decisions on all issues except visitation and classification. On the latter two I was reversed. On the ruling ordering closure as a remedy, the court remanded the case for reconsideration "in light of the present state of conditions." *Ramos v. Lamm*, 639 F.2d 559 (10th Cir.1980).

On remand, I reaffirmed the closure of some of the cellhouses at the existing facili-

ty. Other parts of that facility were permitted to remain open, but not as maximum security units and only after the constitutional violations were remedied. *Ramos,* 520 F.Supp. 1059, 1066 (D.Colo.1981). The remedial phase of this case is now completed. Only the determination of attorney fees and compliance with consent orders remains.

It is important to note that in the remedial phase of this inordinately lengthy case, I have not issued one mandatory order. My deliberate course has been to declare certain actions and conditions violative of the constitution, to enjoin their continued existence or practice and to permit the defendants to determine the manner in which they will henceforth meet or exceed constitutional minima. The last component of the remedial phase to be accepted relates to access to the courts and provides the most dramatic example of my refusal to substitute my judgment for that of the defendants. *E.g., Ramos v. Lamm,* 485 F.Supp. 122, 166 (D.Colo.1979). I have repeatedly advised the defendants that the constitutional rights of inmates to have access to the courts did not require the use of law libraries, law clerks, paralegals and inmate advisors; that much cheaper and better systems were available; and that the state already had a better access plan in place at its state hospital which had received the approval of the Tenth Circuit Court of Appeals. Nevertheless, the defendants presented their turgid plan which calls for all of the above and then some. I have approved the plan solely on the basis that it meets constitutional muster and most assuredly not because I would have it that way or because it is the least expensive. What remains to be seen in the compliance state of this case is whether the plan is even workable.

## II. ATTORNEY FEES

In 1982 I awarded plaintiffs attorney fees and costs in the amount of $742,-715.93. *Ramos,* 539 F.Supp. 730, 754–55 (D.Colo.1982). On appeal, the Tenth Circuit remanded with directions that I recalculate the fees and costs in accordance with the explicit standards set out in its opinion. *Ramos,* 713 F.2d 546, 560 (10th Cir.1983).

After carefully re-evaluating the fees and costs included in the original award, as well as evaluating additional fees and costs which had accrued through April, 1985, I determined that the total award of fees and costs equalled $1,040,183.95. *Ramos,* No. 77–K–1093, slip op. at 12 (D.Colo. June 3, 1985). I withdrew that decision, however, upon the parties' objections and requests for another hearing on the matter.

In August, 1985, a hearing was held. Thereafter, the parties submitted briefs on the issue of fees and costs. Plaintiffs also filed a supplemental application detailing fees and costs which had accrued during the period from April to September, 1985. Recently, plaintiffs filed another supplemental request for the period from September, 1985 through January, 1986. Accordingly, I am now reviewing and ordering payment of all adjudicated attorney fees and costs. The only orders remaining will relate to compliance, the attorney fees related thereto and to the inevitable appeals of all orders.

After the expenditure of enormous amounts of time, money and judicial resources, defendants insouciantly suggest that plaintiffs' case need never have gone to trial and was meaningless because, before this suit was filed, and without pressure from plaintiffs, the state intended to improve prison conditions. This contention is totally inconsistent with the facts presented in this court throughout this case; particularly in the context of hearings and filings on the justifiability of fees. It has been asserted that the Colorado taxpayers have been abused. *Ramos v. Lamm,* 713 F.2d 546, 561–65 (dissent) (10th Cir.1983). I agree fully, but the fault lies not with this court nor with the plaintiffs. The essential underlying issue in this case has always been whether the clearly established and articulated decisions of the Tenth Circuit Court of Appeals and the United States Supreme Court would be

obeyed. *See Ramos v. Lamm*, 485 F.Supp. 122, 168, 178–79 (D.Colo., 1979).

Throughout the mid-1970s there were a number of studies conducted by the American Correctional Association, the Attorney General of the State of Colorado, and others indicating that the conditions of confinement at the prison were substandard and, in many cases, dangerous. On numerous occasions, the ACLU negotiated with the state in an attempt to insure implementation of the recommendations in these plans. Unfortunately, these negotiations were unsuccessful. As a result of near riot in the prison in 1976, the state commissioned a so-called "master plan," prepared by Touche Ross, which documented extensively the significant changes that were necessary if the old prison were to remain open.

The master plan was rejected by the state legislature in 1977. Plaintiffs' counsel asserts that this final refusal to improve conditions was the catalyst for this suit. Several weeks before this case was filed, plaintiffs' attorneys met with officials of the state's department of corrections in an attempt to resolve disputes. Plaintiffs filed suit based upon the representations of Allen Ault, then executive director of the department of corrections, that there were no funds available for improvements and that changes would not occur absent some mechanism to force the Colorado corrections system to comply with the recommendations in the earlier reports. When this case was filed, there were no funds appropriated for the construction of a new prison or for significant improvement of the old prison.

In 1978, after this case was filed, the state legislature appropriated funds for the construction of a new prison. Over the next two years, plaintiffs' counsel regularly met with state prison officials in an attempt to settle the case. Nevertheless, the state refused to close the old facility despite the numerous reports detailing its inadequacies and despite the fact that one of the principal housing units, Cellhouse 7, had been condemned almost three years before the suit was filed.

On the eve of trial, the lawyers for both sides had negotiated a settlement. It fell through, however, because of the inability of the Colorado Attorney General's staff to obtain approval from the legislature's leadership. The governor had required such approval as a condition of settlement. With agreement impossible, plaintiffs were justified in proceeding to trial on the merits. The defense, as noted in my first opinion, followed a strategy throughout the trial of confession and avoidance.

The improvements precipitated by this suit, from all indication, would not have occurred in the foreseeable future by voluntary actions by the state. Compulsion from the federal judiciary enforcing the United States Constitution was necessary to improve the conditions in Colorado's maximum security units. To this very date, efforts to settle this case and end federal judicial intrusion have been rebuffed.

42 U.S.C. § 1988 provides that, in a civil rights action such as the present one, the trial court may, "in its discretion, ... allow the prevailing party ... a reasonable attorney's fee as part of the costs." Under the terms of this statute, it must first be determined whether the party requesting fees is the "prevailing party." If that requirement is satisfied, then the court must carefully examine the party's request for fees to determine whether the number of hours and the hourly rate are reasonable.

The Supreme Court of the United States has stated that ordinarily civil rights plaintiffs are entitled to attorney fees. *Northcross v. Board of Education*, 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973) (*per curiam*); *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968). Although the statute states that the trial court "in its discretion, may" award attorney fees, these cases clearly indicate it would be an abuse of discretion to deny such fees to a prevailing plaintiff.

## A. Prevailing Party

■ As a threshold determination, then, I must decide if plaintiffs are the prevailing parties in this litigation. Generally, plaintiffs "may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (quoting *Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978)). Fees should be awarded to a plaintiff who is only partially successful, especially "where a party has prevailed on an important matter in the course of litigation, even when he ultimately does not prevail on all issues." S.Rep. No. 94–1011, 94th Cong., 2nd Sess., *reprinted in* 1976 U.S.Code Cong. & Ad. News 5908, 5912; *see also Supré v. Ricketts,* 596 F.Supp. 1532 (D.Colo.1984). Once the plaintiff has been determined to have obtained some of the benefits sought in bringing the litigation, the plaintiff should be construed to be the prevailing party especially if the underlying constitutional claim is substantial. *Battle v. Anderson,* 614 F.2d 251, 258 (10th Cir.1980).

■ In the instant case, there is no question that plaintiffs are the prevailing parties. After years of litigation, plaintiffs have vindicated most of the rights that they asserted and the benefits they sought in this action. Further, the constitutional claims in this case were significant and substantial. Accordingly, plaintiffs are entitled to attorney fees.

## B. Reasonableness of Fees

The determination that plaintiffs are the prevailing parties only brings them across the "statutory threshold." *Hensley,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939. The district court must then turn to the more difficult task of deciding what fee is reasonable. *Hensley,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939.

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939; *see also Ramos,* 713 F.2d 546, 552. It follows that "[t]he first step in calculating fee awards is to determine the number of hours reasonably spent by counsel for the party seeking the fees." *Ramos,* 713 F.2d 546, 553.

### 1. Number of Hours Reasonably Expended

According to the Tenth Circuit, in deciding this issue,

[t]he district court must determine not just the actual hours expended by counsel, but which of those hours were reasonably expended in the litigation. When scrutinizing the actual hours reported, the district court should distinguish "raw" time from "hard" or "billable" time to determine the number of hours reasonably expended.

*Ramos,* 713 F.2d 546, 553. In order for the court even to begin to make this analysis, the prevailing party must submit specific time records which reveal,

for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks—for example, how many hours were spent researching, how many interviewing the client, how many drafting the complaint, and so on.

*Ramos,* 713 F.2d 546, 553. The burden of proof lies with the prevailing party to explain and justify the time for which compensation is sought. *Hensley,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941. If time entries are not detailed enough for review, they will be denied.[1] *See Ramos,* 713 F.2d

---

1. Here, many of the earlier fee applications were not so detailed, primarily because they predated the Tenth Circuit's ruling on particularization. Plaintiffs shall not be penalized for reconstruction of their attorneys' time during this period.

546, 553; *Goetz v. Ricketts*, 632 F.Supp. 926, 930 (D.Colo.1986).

■ Further, in making this determination, a number of factors set out by the Tenth Circuit must be considered. First, special scrutiny must be given to time entries exceeding six to seven hours for a single attorney on any given day. *See Ramos*, 713 F.2d 546, 533 n. 2. Second, "the district court should also examine hours allotted to specific tasks." *Ramos*, 713 F.2d 546, 554. If time entries for a particular task, such as drafting the complaint, appear excessive, special scrutiny and explanation are required. *Ramos*, 713 F.2d 546, 554. On this issue, the Tenth Circuit stated that,

> [i]n determining what is a reasonable time in which to perform a given task or to prosecute the litigation as a whole, the court should consider that what is reasonable in a particular case can depend upon factors such as the complexity of the case, the number of reasonable strategies pursued, and the responses necessitated by the maneuvering of the other side.

*Ramos*, 713 F.2d 546, 554.

Third, "the court should determine whether the tasks sought to be charged to the adverse party would normally be billed to a paying client." *Ramos*, 713 F.2d 546, 554. This is necessary because "[l]awyers charging fees to adversaries rather than clients may be less likely to carefully scrutinize the hours spent to determine if payment for the task performed is justified." *Ramos*, 713 F.2d 546, 554. For example, time spent reading background materials designed to familiarize the attorney with the area of law involved in the case is normally absorbed in a private firm's general overhead and would not be billed to a client. Thus, time spent on such back-ground reading is not compensable. *Ramos*, 713 F.2d 546, 554.

Fourth, the court must review the time entries for potential duplication of services. "For example, [if] three attorneys are present at a hearing when one would suffice, compensation should be denied for the excess time." *Ramos*, 713 F.2d 546, 554 (quoting *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C.Cir.1980) (en banc)). "Similarly, if the same task is performed by more than one lawyer, multiple compensation should be denied." *Ramos*, 713 F.2d 546, 554.

Fifth, "non productive" time, or time spent on matters not necessary or related to the case at hand, must be deducted. For example, unless it is demonstrated that work was performed during time spent traveling, that time is generally not compensable. Further, time spent attending speeches and press conferences must be deducted since it is not necessary to the litigation of the case.

In the instant case, although I have previously reviewed most of the time entries to determine their reasonableness, I shall conduct a *de novo* review of all time requested, applying the factors set out above.

Plaintiffs have submitted seven separate applications for attorney fees for the following time periods:

| Application | Time Period Covered |
|---|---|
| 1st | September, 1977 to November, 1979 |
| 2nd | December, 1979 to August, 1980 |
| 3rd | September, 1980 to September, 1981 |
| 4th | October, 1981 to October, 1983 |
| 5th | November, 1983 to March, 1985 |
| 6th | April, 1985 to August, 1985 |
| 7th | September, 1985 to January, 1986 [2] |

Several different attorneys from different organizations represented plaintiffs in this case. The total time requested by plaintiffs, broken down by organization and then according to attorney, legal assistant, or law clerk, is as follows:

---

**2.** The time periods listed are general. Some of the reported time in certain applications, particularly that of Mr. Kahn, covers different dates.

| Attorney, Paralegal, Law Clerk | Application | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | |
| American Civil Liberties Union Foundation of Colorado | | | | | | | | |
| (Holland & Hart) | | | | | | | | |
| James Hartley | 1490.00 | 393.20 * | 381.20 | 261.10 | 97.00 | 13.80 | 5.70 | 2642.00 |
| Luke Danielson | 87.30 | – | – | – | – | – | – | 87.30 |
| Hugh Gottschalk | 159.80 | 184.40 | 30.70 | – | – | – | – | 374.90 |
| Marcy Glenn | – | – | – | 27.50 | 14.90 | – | – | 42.40 |
| Elizabeth Phelan | – | – | – | 74.50 | – | – | – | 74.50 |
| Other Holland & Hart Attorneys | 26.50 | – | – | – | – | – | – | 26.50 |
| Holland & Hart Law Clerks | 191.70 | – | 35.80 | 33.20 | – | – | – | 260.70 |
| Holland & Hart Legal Assts. | 313.50 | 192.70 | 182.20 | 21.30 | 60.70 | – | – | 770.40 |
| (ACLU) | | | | | | | | |
| David Miller | – | – | – | – | 265.15 * | 68.45 * | 95.80 | 429.40 |
| ACLU Legal Assts. | – | – | – | – | 39.90 | 22.05 | 10.15 | 72.10 |
| ACLU Law Clerks | – | – | – | – | 19.05 | – | 3.35 | 22.40 |
| (National Prison Project) | | | | | | | | |
| Peggy Ann Weisenberg | 2597.15 * | 733.90 * | 265.95 | – | – | – | – | 3597.00 |
| Alvin Bronstein | 6.75 | – | 41.25 | – | – | – | – | 48.00 |
| Shawn Moore | – | – | 64.50 | – | – | – | – | 64.50 |
| Ralph Knowles | 797.45 | – | 193.80 * | – | – | – | – | 991.25 |
| Steve Ney | 95.70 | – | – | – | – | – | – | 95.70 |
| (Colorado Coalition of Legal Services) | | | | | | | | |
| Dudley Spiller | 609.15 | – | – | – | – | – | – | 609.15 |
| (Kelly, Haglund, Garnsey, Kahn & Donnell) | | | | | | | | |
| Edwin Kahn | – | 77.70 | 62.60 | 137.60 | 52.80 | 61.50 | 13.30 | 405.50 |
| Arlena Barnes | – | – | – | – | – | 2.30 | – | 2.30 |
| Terre Rushton | – | – | – | 7.30 | – | – | – | 7.30 |
| Barbara Soloman | – | 2.90 | – | – | – | – | – | 2.90 |
| Legal Assistants | – | – | – | 57.30 | 2.60 | 21.30 | – | 81.20 |

TOTAL HOURS REQUESTED: 10707.40

* Figure is different from that in the applicable fee application due to plaintiffs' mathematical errors.

I have reviewed all fee applications, defendants' memoranda in opposition to these applications, and testimony and argument in hearings on the issue of time expenditures. I have also carefully examined every time entry with the Tenth Circuit's instructions in mind.

■ Generally, I find that the time expenditures in this case have been reasonable. Each affidavit submitted by plaintiffs' attorneys represents that hours billed have been carefully reviewed by a supervising partner to insure that all billed time was reasonable and appropriate. Overall, the attorneys have exercised conservative and sound billing judgment.[3] For example, there are instances where time was not included even though it could have been billed.[4] Further, where possible, work was performed by less expensive attorneys, legal assistants, or law clerks.[5]

3. In rare instances where contemporaneous time records were not kept, the reporting attorneys represented that their time estimates were conservative reconstructions. The evidence presented corroborates these representations.

4. Mr. Kahn represented that he excised time not fairly chargeable to the state. Additionally, Mr. Miller reported but did not charge for numerous hours which could have been included.

5. Plaintiffs' attorneys, most notably, Mr. Hartley, have been careful not to bill defendants for time spent orienting junior lawyers, legal assistants, or law clerks. Further, it is clear from the time entries that the new lawyers, legal assistants, and law clerks did not bill for what can be characterized as "startup" time. Additionally, I find that the law clerk and legal assistant services in this case were not part of overhead. Thus, these hours are recoverable on the same basis as

With respect to the specific factors set forth above, I find, first, that most of the attorneys' time is comparable in amount to normal work days for lawyers in private practice in Denver. Exceptions consist of days which involved travel, negotiations, depositions, court appearances, or preparation for those appearances. For example, Ms. Weisenberg billed particularly long hours during the period of October and November, 1979, before and during trial, and during mid-May, 1980, just before appeal. Specifically, during the stretch in which she prepared for appeal, Ms. Weisenberg worked 20 days straight averaging 12 hours per day, with some days as long as 15.9 hours. I have reviewed this time, as well as that of other attorneys billing over seven hours per day, with extreme care and a gimlet eye because of the observations made by Judge Logan in footnote two of his opinion. *See Ramos,* 713 F.2d 546, 533 n. 2. Although some of this time is properly deductible for other reasons, as discussed below, I find the balance to be reasonable and appropriate. However manic such behavior may seem, I note that it is not unusual for attorneys in the private sector to put in long, continuous hours in a "crunch" on the eve of trial or oral argument. Such events are better understood if viewed in terms of a campaign. Such practice is reasonable and such hours are appropriately billed without additional deduction. All evidence presented on this issue established that the attorneys did in fact work diligently and efficiently during the accelerated work periods reported. No evidence was presented to the contrary.

Second, I find that the time spent on specific tasks was not excessive. By defendants' own estimates, as considered in the original 1982 award of fees and costs, approximately eight percent of plaintiffs' billable hours was spent on pretrial preparation and pleadings; 45 percent was spent on discovery, investigation, and interviews of witnesses; 20 percent was devoted to trial preparation; 13 percent was spent on appeal; five percent was spent on settle-

ment; and nine percent of the billings related to compliance orders and attorney fees. Since remand, the bulk of billable hours have related to compliance and fees, thereby increasing the percentage for compliance and fees and decreasing the remaining percentages. As an indication of time spent on particular tasks, these figures are not excessive or unreasonable. Nor would a more specific breakdown by hours prove otherwise. This case was exceedingly complicated because there were unresolved legal issues, the class included several hundred members, and volumes of evidence were presented by both sides. I cannot say, in light of this complexity, that plaintiffs' attorneys devoted unreasonable amounts of time to any one specific task, or that the total hours spent in this case, after deductions are made, were excessive.

Third, I conclude that the hours billed were generally in line with those that would normally be billed to a paying client. For example, plaintiffs' attorneys were careful to exclude any time spent reading background material. The attorneys only billed for time spent reading cases and material specifically related to this case, which is proper and reasonable. It is clear from the time entries that plaintiffs' attorneys were careful not to bill for time spent orienting new lawyers, legal assistants, or law clerks.

Fourth, I conclude that, generally, there has been no duplication of services. As stated above, this case was very complex. Although many attorneys represented plaintiffs in this case, I am persuaded by the evidence that these attorneys worked on different aspects of the case and made special efforts to coordinate their work to avoid any duplication. The same sort of division of labor was employed by defense counsel. In any complex litigation, efficiency derives from organization and coordination rather than lawyers operating independently. Each attorney's presence and input was necessary at the various hearings, depositions, negotiations, and trial proceedings. Thus it is reasonable for

those of the attorneys. *See Ramos,* 713 F.2d 546, 558–59.

plaintiffs to claim compensation for work of all attorneys, even if more than one was present. In other words, one lawyer would not suffice in this case and plaintiffs should not be penalized for their efforts to enhance efficiency. I find, however, that 3.7 hours must be deducted from Hugh Gottschalk's time for attending, but not participating in, the Tenth Circuit argument in this case. Mr. Gottschalk's presence at oral argument was simply not necessary even though he has devoted a significant amount of his professional career to this case and one could not reasonably expect that he would miss such a momentous event.

Finally, I find that some time must be deducted as falling within the category of "nonproductive" or "unrelated" time. To begin with, there are many hours in the listings for time spent traveling. As I stated previously,

> [w]here the listing indicates that work on this case was done during travel time, the hours are properly included. However, where there is no indication that work on this case was done during the travel, the hours should not be included.

*Ramos,* 539 F.Supp. 730, 745. Accordingly, I have deducted the following amounts of time where there is no indication that work was performed while traveling:

| | |
|---|---|
| James Hartley | 66.90 |
| Peggy Weisenberg | 176.20 |
| Ralph Knowles, Jr. | 41.70 |
| Steve Ney | 4.00 |
| Hugh Gottschalk | 3.00 |
| Holland & Hart Law Clerks | 16.00 |
| Holland & Hart Legal Assts. | 8.00 |
| David Miller | 13.55 |
| Dudley Spiller | 28.00 |
| | |
| Total | 357.35 |

There are also many hours claimed for time spent working on the attorney fee applications. As I stated previously,

> attorney fees are proper for work done resolving the fee issue itself. *Love v. Mayor of Cheyenne, Wyoming,* 620 F.2d 235, 237 (10th Cir.1980). I conclude [, however,] that this should only be done for the attorney pursuing the application, not for all of the attorneys who are only

acting as clients. [Thus,] [i]n this case only Mr. Kahn and ... [attorneys and paralegals working for Mr. Kahn] may properly bill for time [spent] on the attorney fee application[s].

*Ramos,* 539 F.Supp. 730, 745. Accordingly, I reject the following hours spent on fees:

| | |
|---|---|
| James Hartley | 42.25 |
| Holland & Hart Legal Assts. | 4.00 |
| Peggy Weisenberg | 178.50 |
| Alvin Bronstein | 21.25 |
| Ralph Knowles, Jr. | 24.40 |
| | |
| Total | 270.60 |

■ Further, there are other hours for miscellaneous matters that I must reject. I deduct 28 hours that Ms. Weisenberg claims for time spent regarding press conferences, speeches, and meetings, and 20.5 hours for twice-stated time. I also deduct 4.2 hours from Mr. Hartley's time for press conferences and 0.5 hours from Mr. Spiller's time for that spent arguing the Howell consolidation before Judge Matsch.

Making the deductions enumerated above, which total 684.65 hours, I conclude that the following hours are reasonable:

| | |
|---|---|
| James Hartley | 2528.65 |
| Luke Danielson | 87.30 |
| Hugh Gottschalk | 368.20 |
| Marcy Glenn | 42.40 |
| Elizabeth Phelan | 74.50 |
| Holland & Hart Law Clerks | 244.70 |
| Holland & Hart Legal Assts. | 758.40 |
| Other Holland & Hart Attorneys | 26.50 |
| David Miller | 415.85 |
| ACLU Law Clerks | 22.40 |
| ACLU Paralegals | 72.10 |
| Peggy Weisenberg | 3193.80 |
| Alvin Bronstein | 26.75 |
| Shawn Moore | 64.50 |
| Ralph Knowles, Jr. | 925.15 |
| Steve Ney | 91.70 |
| Dudley Spiller | 580.65 |
| Edwin Kahn | 405.50 |
| Arlena Barnes | 2.30 |
| Terre Rushton | 7.30 |
| Barbara Soloman | 2.90 |
| Kelly, Haglund, et al. Legal Assts. | 81.20 |
| | |
| Total | 10022.75 |

Next, I must consider the Tenth Circuit's suggestion that the award of time be adjusted based upon the results obtained:

If a plaintiff does not prevail on all claims for relief, the court must determine whether an adjustment is necessary. The Supreme Court has declared that if a plaintiff fails to prevail on claims "unrelated" to those on which he or she succeeds, work on the unrelated unsuccessful claims cannot be compensated. *Hensley v. Eckerhart,* [461] U.S. at [435], 103 S.Ct. at 1940. These claims are to be treated as if raised in a separate lawsuit that the plaintiff lost. *Id.*

*Ramos,* 713 F.2d 546, 556. However, in cases such as the present one, where the unsuccessful claims are closely tied to those claims prevailed upon,

the court must focus on the significance of the overall relief obtained by the plaintiff. If the plaintiff has obtained "excellent results", the attorney's fees should encompass all hours reasonably expended; no reduction should be made because the plaintiff failed to prevail on every contention: "The result is what matters." [*Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940] (footnote omitted). If a plaintiff has achieved "only partial or limited success," then even though the plaintiff's claims were "interrelated, non-frivolous, and raised in good faith," an award determined by multiplying the hours reasonably expended on the whole litigation by a reasonable hourly rate may be excessive: "Again, the most critical factor is the degree of success obtained." *Id.*

*Ramos,* 713 F.2d 546, 556.

■ In the instant case, plaintiffs did not prevail on every claim asserted. As stated previously, the Tenth Circuit reversed my ruling on plaintiffs' claims concerning classification and visitation. On the other hand, the results obtained by plaintiffs in improving the health, safety, and welfare of prisoners in Colorado's maximum security units have been significant. Examination of specific changes resulting from this lawsuit best illustrates the degree of plain-

tiffs' success. Among the most important results obtained in this case was the renovation of Cellhouse 3 and closure of Cellhouses 1 and 7. When this case was first filed, there were approximately 1,000 prisoners living under unconstitutional conditions of confinement at the prison. Now only about 500 are housed in the facility and conditions have improved substantially. Expanded facilities have reduced overcrowding. Staffing, to insure safety in the old prison, as well as in the new facilities, has been increased as a result of this case. Conditions relating to food handling and preparation have improved markedly. Also, medical and mental health care programs have been expanded and improved. Steps have been taken to reduce idleness. Correspondence by non-English speakers is permitted and a plan designed to provide plaintiffs with adequate access to the courts has been implemented.

In the context of the entire case, plaintiffs' unsuccessful claims were minor. Overall, plaintiffs sought relief from a myriad of unconstitutional conditions of confinement. Plaintiffs were successful in litigating the case and demonstrating constitutional violations despite state attempts to question this court's jurisdiction, delay resolution, and oppose the merits on each substantive claim.[6] Plaintiff's success, in a final analysis, is reflected in the closure of substantial portions of the prison, significant improvement in conditions in the other portions of the facility which remained open, and improved conditions of confinement from what otherwise would have occurred in new facilities.

While plaintiffs' success was substantial, I cannot overlook the fact that it was not complete. Nor can I term the results as "excellent" given the fact that plaintiffs did not prevail on certain issues, even though those issues were minor in the context of the entire case. Thus, some reduction in the number of hours is appropriate.

713 F.2d 546, 556.

---

**6.** The Tenth Circuit aptly described the state's position in this case as "stonewalling". *Ramos,*

As the Supreme Court recognized in *Hensley*, "[t]here is no precise rule or formula for making ... [such a reduction]." 461 U.S. 424, 436, 103 S.Ct. 1933, 1941. There are two approaches, however, to making that determination.[7] First, "[t]he district court may attempt to identify specific hours that should be eliminated...." *Hensley*, 461 U.S. 424, 436, 103 S.Ct. 1933, 1941. This approach is favored by the Tenth Circuit in this case: "With appropriate time records we think the court will not have much difficulty determining how much time was spent on unrelated claims for which no compensation may be awarded." *Ramos*, 713 F.2d 546, 556. This suggestion is well-taken but such an approach cannot be applied in this case because all of the claims were related and it is impossible to separate work done on one issue from work done on another. As stated above, plaintiffs sought relief from a myriad of unconstitutional conditions of confinement. Plaintiffs' attorneys' time was directed toward this overall goal, resulting in an overlap of focus on individual sub-objectives at any one time. Thus, for example, when a prisoner was interviewed concerning visitation rights, the interview also covered health care, safety, mail, shelter, food, sanitation, and access to the law library. Similarly, research on a trial or appellate brief focused on the full range of relevant legal issues ranging from classification to safety. I cannot, therefore, reduce plaintiffs' attorneys' time by a determinable amount of hours devoted to tasks on which plaintiffs did not prevail.

The second approach is to "simply reduce the award to account for the limited success." *Hensley*, 461 U.S. 424, 436–37, 103 S.Ct. 1933, 1941. This approach is better-suited to the circumstances of the instant case since it allows me to assess the overall high level of success achieved and the relative unimportance of the unsuccessful claims. Defendants have argued that

plaintiffs' attorneys' time should be reduced by 25 to 33 percent. Such reduction would be excessive and inconsistent with the degree of success obtained by plaintiffs. The issue of visitation, for example, was only mentioned in passing during trial. The issue of classification consumed a little more time, but it was more a fillip to an inconstant administration than a substantive issue.

Although the results obtained were not "excellent", thereby justifying compensation for all hours reasonably expended, plaintiffs' success in this case was very close to that level of achievement. Thus, I find it appropriate to reduce plaintiffs' attorneys' time by only five percent.

### 2. Hourly Rate

The second step in determining the reasonableness of attorney fees is to set a reasonable hourly rate. On this issue, the Tenth Circuit stated that a trial court must first consider

what lawyers of comparable skill and experience practicing in the area would charge for their time. If the lawyer seeking the fee is in private practice, his or her customary rate would be a relevant but not conclusive factor. The hourly rate should be based on the lawyers' skill and experience in civil rights or analogous litigation. Lawyers working outside their fields of expertise may deserve an hourly fee lower than their normal billing rate because of their lack of experience in civil rights field. Salaried public interest lawyers should be assigned a billing rate equal to their counterparts in expertise in private practice. The quality of the lawyer's performance in the case should also be considered in placing a value on his or her services.

*Ramos*, 713 F.2d 546, 553 (footnotes omitted).

---

**7.** The Supreme Court expressly rejected the use of a mathematical approach which compares the total number of issues in the case with those actually prevailed upon. *Hensley*, 461 U.S. 424, 436 n. 11, 103 S.Ct. 1933, 1941, n. 11. As the

Tenth Circuit explained, such an approach "ignores many relevant factors, including the relative importance of the issues." *Ramos*, 713 F.2d 546, 557 n. 7.

In determining appropriate rates in this case, I begin by considering the background and performance of each of plaintiffs'. attorneys. The background of most of these attorneys was detailed in my earlier order and need not be repeated here. *See Ramos*, 539 F.Supp. 730, 747–51. Since that order was entered, plaintiffs have requested compensation for hours billed by five additional attorneys, David Miller, Marcy Glenn, Elizabeth Phelan, Arlena Barnes, and Terre Rushton, and for additional legal assistants and law clerks.

Briefly, Mr. Miller has appeared regularly before me as a representative of plaintiffs on matters of compliance since 1983. He is staff counsel and legal director for the American Civil Liberties Union Foundation of Colorado, and has performed ably in this case. Ms. Glenn and Ms. Phelan are both employed as associates with the Denver law firm of Holland & Hart. Ms. Glenn's work in this case was primarily devoted to analysis of medical and mental health plans and preparation of interrogatories. Ms. Phelan's efforts consisted of preparation of plaintiffs' motion for entry of remedial orders. The hours claimed for these tasks, which did not require the skills of more experienced attorneys, represent necessary and efficient work. Similarly, hours claimed by Ms. Barnes and Ms. Rushton shall be allowed as necessary and efficient. Ms. Barnes is an associate and Ms. Rushton is a partner with the Denver law firm of Kelly, Haglund, Garnsey, & Kahn. Their time was spent assisting Mr. Kahn with the attorney fees and costs applications.

The additional legal assistants and law clerks are employed by the ACLU and by Kelly, Haglund, Garnsey, & Kahn. As with those legal assistants and law clerks employed by Holland & Hart, I have examined the time claimed to determine whether these persons' efforts enhanced the value of the lawyers' services. As discussed above, I have deducted some of this time under the Tenth Circuit's standards. The balance, however, is reasonable and compensable in that it did enhance the attorneys' services.

Next, I turn to the issue of what lawyers of comparable skill and experience practicing in Denver would charge for their time. Plaintiffs' lawyers' and assistants' current customary rates provide a starting point for an analysis of this issue. These rates, as stated in plaintiffs' fifth and sixth applications, are as follows:

| | |
|---|---|
| Alvin Bronstein | $200/hr. |
| James Hartley | 150 |
| Ralph Knowles, Jr. | 150 |
| Edwin Kahn | 150 |
| Luke Danielson | 140 |
| Other Holland & Hart Attys. | 140 |
| Steve Ney | 125 |
| Dudley Spiller | 120 |
| Peggy Weisenberg | 115 |
| Shawn Moore | 115 |
| Hugh Gottschalk | 115 |
| Terre Rushton | 110 |
| Barbara Soloman | 100 |
| Elizabeth Phelan | 100 |
| David Miller | 100 |
| Marcy Glenn | 75 |
| Arlena Barnes | 70 |
| Holland & Hart Legal Assts. | 40 |
| Holland & Hart Law Clerks | 40 |
| Kelly, Haglund, et al. Legal Assts. | 40 |
| ACLU Legal Assts. | 35 |
| ACLU Law Clerks | 25 |

Although these rates are relevant on the issue of current market rates, they are not conclusive. At the most recent hearing on attorney fees in this case, defendants' expert witnesses, David Brougham and John Breit, concluded that these rates were generally in excess of those rates charged by civil rights litigators in the Denver legal community. They found that the prevailing market rate in Denver for work in civil rights or analogous areas of law to range from $75/hour to $100/hour, depending on the amount of experience of the attorneys involved. Mr. Brougham noted, however, that the difficulty in this area was largely resolved by the *Ramos* decisions in this court and in the Court of Appeals. That these attorneys were pathfinders cannot be gainsaid.

Generally, I agree with defendants' expert witnesses' assessment of the prevailing market rate in Denver for work on civil rights cases. These figures do not take

into account, however, the circumstances of this particular case. To begin with, as stated above, this case was very complex and was the first of its kind to assert totality of conditions as a measure of Eighth Amendment violations. Additionally, it was a class action with several hundred plaintiffs. Second, this case has set the precedent with the establishment of significant new law in the area of prisoners' rights and even in the area of attorney fees. Thus, this case differs from the spate of civil rights cases in which trial courts and counsel extrude constitutional poignancy from the loss of an inmate's socks. *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), overruled *Daniels v. Williams*, — U.S. —, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Boren v. City of Colorado Springs*, 624 F.Supp. 474 (D.Colo.1985); *Williams v. Morris*, 697 F.2d 1349 (10th Cir.1982) (per curiam).

Recognizing the significance and complexity of this case as well as the favorable performance by each of the attorneys in this case, I find, generally, that a fee of $100/hour is appropriate, with certain exceptions. Those attorneys which I have determined merit a higher rate of $150/hour are Mr. Hartley, Mr. Kahn, Mr. Knowles, and Mr. Bronstein. Each of these attorneys have greater experience which requires this higher hourly rate. Mr. Hartley and Mr. Knowles, for example, were primarily responsible for the most difficult issues in this case. Further, Mr. Kahn and Mr. Bronstein are nationally known experts in their respective fields. The attorneys for which a lesser rate is required are Ms. Glenn and Ms. Barnes, due to lesser experience and lower current billable rates, and Mr. Miller, because the tasks he performs with respect to the compliance phase of this case, while crucial, are

not as complex or difficult as those which other lawyers performed in establishing liability. For such tasks Mr. Miller would merit the full amount of his current rate.

Further, I find that the rates requested for the legal assistants and law clerks in this case are reasonable and are consistent with current market rates. Accordingly, the rates appropriately charged and fees assessed for the attorneys, legal assistants, and law clerks are as follows:

| Attorney, Legal Asst., Law Clerk | Total Hours (Adjusted) | Rate ($/hr.) | Award ($) |
|---|---|---|---|
| James Hartley | 2402.21 | 150 | 360,331.50 |
| Alvin Bronstein | 25.41 | 150 | 3,811.50 |
| Edwin Kahn | 385.22 | 150 | 57,783.00 |
| Ralph Knowles, Jr. | 878.89 | 150 | 131,833.50 |
| Luke Danielson | 82.93 | 100 | 8,293.00 |
| Other Holland & Hart Attys. | 25.17 | 100 | 2,517.00 |
| Steve Ney | 87.11 | 100 | 8,711.00 |
| Dudley Spiller | 551.61 | 100 | 55,161.00 |
| Peggy Weisenberg | 3034.11 | 100 | 303,411.00 |
| Shawn Moore | 61.27 | 100 | 6,127.00 |
| Hugh Gottschalk | 349.79 | 100 | 34,979.00 |
| Terre Rushton | 6.93 | 100 | 693.00 |
| Barbara Soloman | 2.75 | 100 | 275.00 |
| Elizabeth Phelan | 70.77 | 100 | 7,077.00 |
| Arlena Barnes | 2.18 | 70 | 152.60 |
| Marcy Glenn | 40.28 | 75 | 3,021.00 |
| David Miller | 395.05 | 80 | 31,604.00 |
| Holland & Hart Legal Assts. | 720.48 | 40 | 28,819.20 |
| Holland & Hart Law Clerks | 232.46 | 40 | 9,298.40 |
| Kelly, Haglund et al. Legal Assts. | 77.14 | 40 | 3,085.60 |
| ACLU Legal Assts. | 68.49 | 35 | 2,397.15 |
| ACLU Law Clerks | 21.28 | 25 | 532.00 |
| TOTAL | | | $1,059,913.45 [8] |

## III. COSTS

In addition to requesting attorney fees, plaintiffs seek reimbursement of a total of $118,407.84 for expenses that were incurred pursuing this lawsuit. In the original award of fees and costs, plaintiffs were allowed $32,782.43 out of a requested amount of $106,721.59 for costs. *Ramos*, 539 F.Supp. 730, 754. The Tenth Circuit agreed with the reasoning underlying this award. *Ramos*, 713 F.2d 546, 560. Thus, I

---

**8.** Defendants have objected to the approach used here of applying current rates (with modification) to hours of work performed over several years. Although other courts have adopted different approaches, *see Ramos*, 539 F.Supp. 730, 746 (citing cases), the Tenth Circuit explicitly adopted and approved the approach used here: "The hourly rate at which compensation is awarded should reflect rates in effect at the

time the fee is being established by the court, rather than those in effect at the time the services were performed." *Ramos*, 713 F.2d 546, 555. As the court recognized, this approach allows compensation for inflation and interest and obviates the impossible task of guessing "when periodic billings would have been made and paid in an analogous private practice situation." *Ramos*, 713 F.2d 546, 555.

shall only review and consider those costs incurred since that original award, which total $11,686.25.

"Items that are normally itemized and billed in addition to the hourly rate should be included in fee allowances in civil rights cases if reasonable in amount." *Ramos*, 713 F.2d 546, 559. Conversely, items which are normally absorbed as part of a law firm's overhead are not awardable. *Ramos*, 713 F.2d 546, 559. Thus, expenses listed for items properly included in overhead in plaintiffs' more recent applications are deducted as follows:

| | |
|---|---|
| photocopying | $2188.69 |
| postage and delivery | 596.54 |
| telephone | 2677.89 |
| computerized legal research | 148.90 |
| supplies | 2.95 [9] |

■ Additionally, I must exclude $560.00 requested for airfare for Shawn Moore. Travel expenses for out-of-state attorneys are not compensable in this case since there was no need to employ such counsel. *Ramos*, 713 F.2d 546, 559; 539 F.Supp. 730, 753–54.

The balance of the expenditures are proper and reasonable. For the most part, these costs were incurred with respect to expert witnesses and transcripts. *See Ramos*, 713 F.2d 546, 559–560; 539 F.Supp. 730, 754. Also included are costs incurred in traveling to and from Canon City. *See Ramos*, 713 F.2d 546, 559; 539 F.Supp. 730, 753–54.

Accordingly, of plaintiffs' most recent requests, I will allow $6,174.97. Thus, of a total cost and expense prayer of $118,-407.84, plaintiffs shall be reimbursed for expenses totalling $38,957.40.

IT IS THEREFORE ORDERED THAT:

1. Judgment shall enter for plaintiffs in the amount of $816,088.42 which represents $1,059,913.45 for attorney fees plus $38,957.40 for costs less $282,782.43 which defendant previously paid to plaintiffs in partial satisfaction.[10] Interest at the legal rate shall run from this date forward.

2. There being no just reason for delay I direct the entry of final judgment pursuant to Fed.R.Civ.P. 54(b).

Dated at Denver, Colorado this 8th day of April, 1986 nunc pro tunc March 27, 1986.

**9.** Since the inception of this lawsuit, which occurred before I came to the bench, office technology has advanced considerably. State of the art systems are now able to correlate many office expenses with individual client accounts. Items such as copying and telephone expenses which were previously absorbed in firm overhead are now regularly charged to individual clients. Thus, those items may be included in any assessment of costs pursuant to § 1988. In my earlier order, however, I held that these expenses were not properly assessed against defendants since there was no indication that they were not part of overhead. *Ramos*, 539 F.Supp. 730, 753. The Tenth Circuit affirmed this view. *Ramos*, 713 F.2d 546, 759. I agree with Emerson that "[a] foolish consistency is the hobgoblin of little minds adored by little statesman and philosophers and divines." Although consistency may be the hall mark of mediocrity, it is also a cornerstone of *stare decisis*. Moreover, as a matter of judicial policy, when attorneys demand substantial rates for their time, fees should not be surreptitiously increased by passing firm overhead costs on to clients or, as in this case, the opposing party. Accordingly, in the instant case, costs requested for photocopying, telephone, postage and delivery, computerized legal research, and supplies will be treated as nonbillable items which are noncompensable in an award of costs.

**10.** On May 20, 1985, I entered an interim order awarding plaintiffs attorney fees in the amount of $250,000.00 and costs in the amount of $32,-782.43. *Ramos*, No. 77–K–1093 (D.Colo. May 20, 1985). On June 4, 1985, defendants paid $283,446.33 into the court in satisfaction of this interim judgment, along with interest which had accrued since May 20th. Defendants are entitled to a credit for the amount of the judgment. Defendants are not, however, entitled to deduct the interest paid on the May 20th judgment. Thus, defendants have been credited only for the amount of $282,782.43.