DAVID C., et al., Plaintiffs,

v.

Michael LEAVITT, et al., Defendants.

Civ. No. 93–C–206W.

United States District Court,
D. Utah,
Central Division.

July 3, 1995.

D. James Morgan, Daniel A. Kaplan, Michael P. O'Brien, Jones, Waldo, Holbrook & McDonough, Salt Lake City, UT, William L. Grimm, Elizabeth Steyer, Patrice McElroy, and Martha Matthews, National Center for Youth Law, San Francisco, CA, Richard M. Pearl, Law Offices of Richard M. Pearl, San Francisco, CA, for Plaintiffs.

L.A. Dever, Utah Attorney General's Office, Salt Lake City, UT, Craig L. Barlow, Linda Luinstra–Baldwin, Salt Lake City, UT, Philip C. Pugsley, Salt Lake City, UT, for Defendants.

**MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS**

WINDER, Chief Judge.

This matter is before the court on Plaintiffs David C., et al.'s ("Plaintiffs") motion for attorneys' fees and costs pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. Defendants Michael Leavitt, et al. ("Defendants") responded to Plaintiffs' motion, conceding some items in Plaintiffs' fee petition, but vigorously opposing numerous others.

The court heard oral argument on February 8, 1995. William L. Grimm, Michael P. O'Brien, and Richard M. Pearl appeared on behalf of Plaintiffs. Carol Clawson, Linda Luinstra–Baldwin, and Philip C. Pugsley represented Defendants. Before the hearing, the court considered carefully the lengthy memoranda, numerous declarations, and voluminous materials submitted by the Parties, and also read certain of the authorities cited. Following oral argument, and since taking the matter under advisement, the court has further considered the arguments of counsel, read and considered the memoranda and accompanying declarations, studied the cited authority, and done such additional research as the court deemed prudent. Now being fully advised, and good cause appearing, the court enters the following Memorandum Decision and Order.

## I. *BACKGROUND*

On October 26, 1994, Plaintiffs filed a petition for attorney's fees and costs in the amount of $1,117,454.12.[1] In response, Defendants filed a memorandum on December 19, 1994 proposing that the court limit any fee award to $241,122. In view of the vast disparity between these figures, the issue now before the court is the amount of attor-

---

**1.** After conceding a number of Defendants' objections and making downward adjustments, and after increasing hours to reflect the time spent in replying to Defendants' Response, the revised amount which Plaintiffs presently seek is $1,158,243.48. The attorney's/clerk's fees portion of this figure reflects a 5% across the board reduction that Plaintiffs have voluntarily made to compensate for time that *may* have been "unpro-

ductive, unnecessarily duplicative, recorded or added in error, or otherwise not reasonably related to the attainment of the goals" of the litigation. Without the 5% reduction, the requested figure would be $1,210,680.60. *See* Plaintiffs' Reply Memorandum at App. A, Case No. 93–C–206W (Jan. 26, 1995) [hereinafter "Plaintiffs' Reply"].

ney's fees and costs to which Plaintiffs are entitled.

The action on which this motion is based involved a class action suit seeking declaratory and injunctive relief and alleging that Defendants[2] had violated, and continued to violate, the federal constitutional and statutory rights of those Utah children who were, or would be, in foster care in the custody of the Utah Department of Human Services ("DHS") or the Division of Family Services ("DFS").[3] *See* Complaint at p. 2, Case No. 93–C–206W (Feb. 25, 1993). Among other things, Plaintiffs' Complaint alleged that De-

fendants had failed to: "investigate complaints of child abuse promptly or properly, make reasonable efforts to keep families together, provide appropriate placements and proper care to children in their custody, properly evaluate foster homes and train foster parents, and provide foster homes to children."[4] *See* Order of Preliminary Approval of Settlement Agreement at p. 1, Case No. 93–C–206W (June 3, 1994). Before filing the Complaint, Plaintiffs had spent approximately fifteen months in pre-filing investigation.[5] During the pre-filing period, Plaintiffs met with Defendants in May, June, and August of 1992, and again in early February of

**2.** At the time of the February 25, 1993 filing of this suit, the Defendants were Michael Leavitt, in his official capacity as Governor of Utah; Michael Stewart, in his official capacity as Director of the Department of Human Services; Ronald Stromberg, in his official capacity as Director of the Office of Social Services; and Barbara Thompson, in her official capacity as Director of the Division of Family Services.

**3.** Plaintiffs assert that this action was initiated when Donna Brown, former Court Appointed Special Advocate volunteer in the juvenile court for Salt Lake City, Utah, contacted the National Center for Youth Law ("NCYL"), based in San Francisco, California, in November of 1991. *See* Plaintiffs' Memorandum in Support of Award of Reasonable Attorneys' Fees and Costs at p. 4, Case No. 93–C–206W (Oct. 26, 1994) [hereinafter "Plaintiffs' Memorandum"]. Plaintiffs state that Ms. Brown informed the NCYL that she had been unable to find someone in Utah willing to file a lawsuit on behalf of Utah foster children and child abuse and neglect victims, and asked the NCYL to file a lawsuit on these children's behalf. *Id.* at p. 5. The NCYL agreed to do so "only if she could convince them that the abuses she recounted were not isolated incidents." *Id.*

After extensive pre-filing investigation and several meetings with Defendants, the NCYL sought association with local counsel. *Id.* at p. 9. After several refusals, "either because of the time commitment required for such litigation or for other reasons," Jones, Waldo, Holbrook & McDonough ("Jones & Waldo"), a Salt Lake City law firm with substantial experience in litigation and civil rights matters, agreed to act as co-counsel in September 1992. *Id.*

**4.** Specifically, the Complaint set forth the following causes of action:

(1) Violation of Fourteenth Amendment Due Process—alleging that foster children were deprived of necessary medical treatment. *See* Complaint at ¶ 317.
(2) Violation of Fourteenth Amendment Due Process and 42 U.S.C. § 1983—alleging that foster children were deprived of constitutional rights to safe conditions, personal security and

bodily integrity, and to have care and treatment decisions made for them and provided to them in accordance with professional judgment. *See id.* ¶ 318.
(3) Violation of Fourteenth Amendment Due Process—alleging the State deprived foster children of rights and entitlements created by state law without due process. *See id.* ¶ 319.
(4) Violation of Fourteenth Amendment Equal Protection—alleging that foster children have federal and state-created rights to investigations and protective measures, but that victims of child abuse receive disparate protections based solely on the region of the state in which they reside. *See id.* ¶ 320.
(5) Violation of certain rights under the federal Adoption Assistance and Child Welfare Act of 1980—*i.e.*, (a) a written case plan, (b) foster placement in the least restrictive setting in close proximity to parents, and to assist parents to improve conditions in the home, or to achieve an alternative permanent placement, (c) right to periodic review of their cases, (5) right to placement in foster homes that conform to nationally recommended standards, and (6) right to procedural safeguards when removed from parental home, change in placement occurs, or there is an alternation in the parent-child visitation plan. *See id.* ¶ 321.
(6) Violation of federal Child Abuse Prevention and Treatment Act—alleging violations of foster children's rights to prompt investigation of abuse and neglect reports, immediate steps to protect children's health and welfare in the face of those reports, and rights to administrative procedures, trained personnel, and facilities necessary to ensure their safety. *See id.* ¶ 322.

**5.** Defendants were aware by late 1991 that NCYL attorneys were traveling to Utah to investigate the child welfare system. *See* Affidavit of Linda Luinstra at ¶ 2 (Dec. 16, 1994) [hereinafter "Luinstra Aff."].

1993 to discuss their concerns about the Utah child welfare system.[6] *See* Luinstra Aff. at ¶¶ 3–4. Plaintiffs also met with Attorney-General-elect Jan Graham, Governor-elect Michael Leavitt, and Governor Leavitt's new director of Human Services, Michael Stewart.[7] *See* William L. Grimm Declaration at ¶ 24 (Oct. 26, 1994).

On March 16, 1993, Plaintiffs filed to certify the suit as a class action, which Defendants opposed in part. After a hearing, the Honorable Samuel Alba, United States Magistrate Judge, granted Plaintiffs' motion on May 7, 1993. Defendants later objected to Judge Alba's order.[8]

Prior to certification, Defendants filed a motion to extend the time to respond to Plaintiffs' certification motion. *See* Memorandum in Support of Defendants' Motion for Extension, Case No. 93–C–206W (Apr. 5, 1993). One of the stated reasons for requesting the extension was that "Defendants plan to file a Motion to Dismiss addressing many of the claims alleged in the Complaint." *Id.* at p. 2.

Also prior to certification, Defendants had filed a motion for a protective order:

> requiring plaintiffs and their counsel to conduct discovery in this action under the Federal Rules of Civil Procedure and further providing that the State does not have to respond to any pending or future Government Records Access and Management Act (GRAMA) . . . requests concerning the subject of this action during its pendency.

*See* State's Motion for Protective Order at p. 1, Case No. 93–C–206W (Apr. 13, 1993). Later, the Parties entered into a series of stipulations regarding contacts with class members, foster parents, and state employees.

Although Defendants' time to respond was extended several times, the Complaint was never answered. Instead, beginning in late April of 1993 and continuing to May of 1994, the Parties entered into settlement negotiations.[9] As a result of those negotiations, a Settlement Agreement ("Agreement") was entered into by the Parties. On August 29, 1994, this court entered an Order providing that the Order and the Agreement "shall apply to and be binding upon the Parties to this action, and upon their employees, heirs, successors-in-interest, and assigns." *See* Order at p. 2, Case No. 93–C–206W (Aug. 29, 1994).

The Agreement sets forth general operating standards and directs Defendants to ensure that the Utah DHS and the DFS child welfare system comply with the Agreement. Defendants are to maintain full operating authority over DHS and DFS and are to have discretion as noted in the Agreement to devise means by which to achieve compliance with the Agreement. The Agreement also creates a Monitoring Panel and establishes a mechanism for monitoring and oversight of the Agreement's provisions. *Id.* at p. 2. The Agreement further provides that this court is to retain jurisdiction over this matter. *Id.* at p. 3. As Defendants readily

6. Defendants point out that Plaintiffs' pre-filing investigation "coincided with administrative and legislative efforts by the State of Utah to assess and reform the State's child welfare system." Defendants' Response to Motion for Award of Attorneys' Fees and Costs at p. 6, Case No. 93–C–206W (Dec. 19, 1994) [hereinafter "Defendants' Response"]. The successful efforts included passage of Senate Bill 74, establishing the Termination of Parental Rights Act, which "provides a judicial process for voluntary and involuntary severance of the parent-child relationship." *See* Utah Code Ann. §§ 78–3a–401 to –414 (Supp. 1994) (effective July 1, 1992). They also included a legislative audit of the DFS and the child welfare system. The results of that audit were not released until January 14, 1994. In addition, the Child Welfare Reform Act was passed by the Utah legislature in the 1994 General Session and took effect July 1, 1994. *See* Defendants' Response at pp. 6–7.

7. Plaintiffs contend that the lawsuit was filed only after these meetings—"only after defendants would not agree to a list of basic reforms." Grimm Dec. at ¶ 24.

8. Defendants asserted that the certification order was improper in that Judge Alba had not set out his findings of fact and recommendations "in the form required by 28 U.S.C. § 636." *See* Defendants' Objection to Order Re: Class Certification at p. 3, Case No. 93–C–206W (May 12, 1993).

9. Negotiations were conducted on April 27, May 18, June 9, July 8, and November 19 of 1993, and January 7, March 22, April 1, and April 25 of 1994. Pamela J. Atkinson, Vice President of Mission Services for Intermountain Health Care, acted as a neutral third party to mediate the negotiations.

admit, "[t]he Settlement Agreement, signed by the parties in May 1994 resolved all of the claims brought by the Plaintiffs in this action." Defendants' Response at p. 41.

Reserved in the Order was the issue of entitlement to and the amount of attorney's fees and costs incident to the action. Instead, the Parties agreed to meet in good faith in an attempt to reach a settlement of that issue. The Parties were unable to reach agreement, however, and this motion ensued.

Defendants oppose the fee petition on numerous grounds, which center generally around the arguments that Plaintiffs should not be compensated for out-of-area rates, for "activities not related to the lawsuit," and that "Plaintiffs are only entitled to fees for work related to those portions of the Settlement Agreement that include relief that would have otherwise been required by federal law." *See* Defendants' Response at p. 37.

## II. *ANALYSIS*

■ Title 42 U.S.C. § 1988 provides that in federal civil rights actions "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). "[T]he extent of a plaintiff's success is a crucial factor that the district courts should consider carefully in determining the amount of fees to be awarded." *Id.* at 438 n. 14, 103 S.Ct. at 1942 n. 14. When considering fee petitions, the district court should be mindful of the Supreme Court's instruction that "[a] request for at-

torney's fees should not result in a second major litigation." *Id.* at 437, 103 S.Ct. at 1941.

■ Typically, the district court must address several broad issues in order to arrive at a reasonable fee award. First, as a preliminary matter, a plaintiff[10] must be found to be "prevailing" in order to cross the statutory threshold and become a candidate for a § 1988 fee award. *Id.* at 433, 103 S.Ct. at 1939. Second, once it is determined that a plaintiff is prevailing, "[i]t remains for the district court to determine what fee is 'reasonable.'" *Id.* This is done by arriving at a "lodestar" figure—calculating "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.; see also Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984). Third, the district court may then adjust the lodestar upward or downward, most often in consideration of the results obtained by the plaintiff. *See Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940. Finally, the court must determine to what extent a plaintiff will be compensated for time spent preparing the fee petition itself.

### A. *Prevailing Party*

■ As a threshold determination, the court finds that Plaintiffs are the prevailing party in this litigation.[11] The formulation for what comprises a prevailing party is a generous one. *Farrar v. Hobby,* 506 U.S. 103, ——, 113 S.Ct. 566, 572, 121 L.Ed.2d 494 (1992).[12] Plaintiffs typically are considered prevailing parties for attorney's fees purposes " 'if they succeed on *any significant issue* in litigation which achieves *some* of the benefit the parties sought in bringing suit.' "

**10.** "A prevailing defendant may recover an attorney's fee only where the suit was vexatious, frivolous, or brought to harass or embarrass the defendant." *Hensley,* 461 U.S. at 429 n. 2, 103 S.Ct. at 1937 n. 2 (citing H.R.Rep. No. 94–1558, p. 7 (1976)).

**11.** For reasons which will become evident in Part C *infra,* the court makes this assessment even though Defendants have not specifically argued that Plaintiffs are *not* a prevailing party.

**12.** *Farrar* exemplifies just how generous the formulation for "prevailing" party can be. There,

the Court held that a plaintiff who had spent ten years litigating a seventeen million dollar suit against six defendants, but who ultimately received just one dollar from one defendant at trial, was nevertheless a "prevailing" party for § 1988 award purposes. *See Farrar,* 506 U.S. at ——, 113 S.Ct. at 570 (holding that plaintiff who wins nominal damages is prevailing party). However, the Court affirmed the court of appeal's denial of any award, finding that an award would not be "reasonable." *Id.,* 113 S.Ct. at 574–75 (finding that the degree of a prevailing party's "overall success" determines the reasonableness of an award).

*Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939 (emphasis added) (quoting *Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978)). The "touchstone" to, and precondition of, prevailing party status is the " 'material alteration of the legal relationship of the parties.' " *Beard v. Teska,* 31 F.3d 942, 950 (10th Cir.1994) (citing to *Farrar* and *Texas State Teachers Ass'n v. Garland Independent Sch. Dist.,* 489 U.S. 782, 792–93, 109 S.Ct. 1486, 1493–94, 103 L.Ed.2d 866 (1989)). Once a plaintiff becomes entitled to enforce a settlement against a defendant, a material alteration of the legal relationship between the parties occurs. *Farrar,* 506 U.S. at ——, 113 S.Ct. at 574.

In the absence of a decision on the merits—as in the Agreement here—the Tenth Circuit has adopted the *Nadeau* test for determining whether a plaintiff is prevailing. *See, e.g., J & J Anderson, Inc. v. Town of Erie,* 767 F.2d 1469, 1475 (10th Cir.1985) (adopting *Nadeau v. Helgemoe,* 581 F.2d 275 (1st Cir.1978)). To meet that test, a plaintiff must show two things: "(1) that [the] lawsuit is causally linked to securing the relief obtained, and (2) that the defendant's conduct in response to the lawsuit was required by law." *Foremaster v. City of St. George,* 882 F.2d 1485, 1488 (10th Cir.1989), *cert. denied,* 495 U.S. 910, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990) (citations and internal quotations omitted). This test can be characterized thusly:

> A party may also be deemed to have prevailed sufficiently to warrant the award of attorneys' fees under a two part "catalyst test." Under this test a plaintiff must have been a "significant catalyst" causing a defendant to change position, and the de-

fendant's change in position must have been required under law.[13]

*City of Chanute, KS v. Williams Natural Gas Co.,* 31 F.3d 1041, 1048 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1254, 131 L.Ed.2d 135 (1995) (citations omitted). A typical situation in which the catalyst test applies occurs when "the parties reach a settlement agreement resulting in dismissal of the suit with no further court action." *Id.* at 1049.

The Plaintiffs here are a prevailing party because this litigation meets both prongs of the *Nadeau* test. First, it is clear to the court that this lawsuit was a "substantial factor or significant catalyst" in Defendants' response. *See Foremaster,* 882 F.2d at 1488; *Supre v. Ricketts,* 792 F.2d 958, 962 (10th Cir.1986). It need not have been the sole reason[14] for Defendants' response. *Foremaster,* 882 F.2d at 1488. Furthermore, Defendants virtually concede this prong. *See* Defendants' Response at p. 52 (admitting that Plaintiffs' suit "helped along" part of the "reform effort"). Second, Defendants also admit that part of the Agreement was required by law: "Giving credit where credit is due, the Defendants acknowledge that the Plaintiffs are entitled to be awarded a fee for that portion of the reform effort that was 'required by law' and could be considered to have been helped along by their suit." Defendants' Response at p. 52. Specifically, Defendants concede that two of the six causes of action assert claims on which this court could grant relief, and that twelve of the subparagraphs of the Agreement are required by law. *Id.* at pp. 40–41.[15] In view of *Farrar*'s generous formulation of "prevail-

---

**13.** Although not in the prevailing party argument context, Defendants have asserted that "the Plaintiff has not shown that the Action taken by the State of Utah in passing the Child Reform Act or in entering the Settlement Agreement was required by law." Defendants' Response at p. 39. However, it is clear that what is important is a "change in position" by Defendants, not that Plaintiffs could not have, by reason of law, specifically required the State to pass the Act or enter into the Agreement.

**14.** Defendants have argued that the types of child welfare reforms in which the Agreement resulted were already under consideration by the State. *See supra* note 6 and accompanying text. How-

ever, because Plaintiffs' action need not have been the sole cause of Defendants' change in position, this is not determinative.

**15.** Defendants concede that Plaintiffs could have prevailed on the first two causes of action. *See* Defendants' Response at p. 40; *see also supra* note 4 and accompanying text (listing the six causes of action). Defendants also concede that the following portions of the Agreement were required by law: (1) 3 of the 12 subparagraphs of Section IV—Quality and Safety of Out-of-Home Care; (2) part of the provisions dealing with adequate health and mental care; and (3) case plans and case reviews. Defendants' Response at p. 41–42.

ing," this is sufficient to meet the second prong of the *Nadeau* test.

### B. Reasonableness of Fee

■ Since the court finds that Plaintiffs are a prevailing party, it now confronts the task of determining what fee is reasonable. "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended ... multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services." *Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939. "There is a strong presumption that the lodestar represents the reasonable fee to which counsel is entitled." *Utah Int'l, Inc. v. Department of the Interior*, 643 F.Supp. 810, 828 (D.Utah 1986) (citing *Blum*, 465 U.S. at 897, 104 S.Ct. at 1548). Plaintiffs bear the burden "to prove and establish the reasonableness of each dollar, each hour, above zero." *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1210 (10th Cir.1986).

### 1. Reasonable Hourly Rates

■ "The establishment of hourly rates in awarding attorneys' fees is within the discretion of the trial judge who is familiar with the case and the prevailing rates in the area." *Lucero v. City of Trinidad*, 815 F.2d 1384, 1385 (10th Cir.1987) (citing *Gurule v. Wilson*, 635 F.2d 782, 794 (10th Cir.1980)). "The first step in setting a rate of compensation for the hours reasonably expended is to determine what lawyers of comparable skill and experience practicing in the area in which the litigation occurs would charge for their time." *Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir.1983). "[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Beard*, 31 F.3d at 956 n. 11. As a general rule, local fee rates should be applied

unless the case involved is most unusual or requires such special skills that a reasonably competent local trial attorney could not handle it. *See Ramos*, 713 F.2d at 555. The attorney's years of experience is an important factor in fixing rates. *Jane L. v. Bangerter*, 828 F.Supp. 1544, 1552 (D.Utah 1993) (citing to *In re WICAT Sec. Lit.*, 671 F.Supp. 726, 732 (D.Utah 1987)).

■ Defendants do not object to the hourly rates requested by the Jones & Waldo attorneys. However, although acknowledging that the NCYL attorneys are experts in the field of child welfare litigation, Defendants take exception to the hourly rates requested by the NCYL attorneys and law clerks.[16] NCYL attorney's rates range from $310 per hour for Richard Pearl,[17] who prepared Plaintiffs' fee application, to $155 per hour for Elizabeth Steyer.[18] Defendants argue that "considerable expertise is available in the Utah market without paying premium rates" and that the case was not so complex that it warranted out-of-area fees.

Plaintiffs counter that no Utah law firm possessed the resources, willingness, or expertise to have: (1) conducted a "comprehensive and thorough pre-filing investigation," (2) found and consulted with leading experts in various fields, (3) anticipated the "problems that had developed in similar cases," and (4) negotiated and prepared "a settlement that completely reshaped and restructured the State's entire child welfare system." Plaintiffs' Reply at p. 5. Plaintiffs point to *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 663 F.Supp. 1360 (D.Kan. 1987), *aff'd*, 899 F.2d 951 (10th Cir.), *cert. denied*, 110 S.Ct. 3241 (1990), as illustrative of the reasons that out-of-area fees are warranted.

Although the court recognizes the quality of work that Plaintiffs' attorneys have performed, there is insufficient evidence in the record to overcome the strong presumption that local area rates should apply. Our research indicates that the general rule is over-

---

**16.** NCYL requests $90 per hour compensation for law clerks.

**17.** Mr. Pearl was first admitted to a Bar in 1970 and is an expert in preparing fee applications.

**18.** Ms. Steyer was first admitted to a Bar in 1991.

come only in exceptional and rare cases, such as in *Reazin,* which was a complex antitrust case, and in *National Wildlife Federation v. Hanson,* 859 F.2d 313 (4th Cir.1988), a complex environmental case, wherein the plaintiff provided explicit and uncontroverted evidence of the need for out-of-area counsel. *See id.* at 317–18. Moreover, the court's knowledge of this case and the issues involved therein do not persuade us that it rises to the level of *Reazin,* nor is it that very "unusual" case involving "such special skills" that is referred to in *Ramos v. Lamm.* In particular, the court is cognizant that *Ramos* does not provide for an exception to the general rule any time out-of-area attorneys might have handled a case "better," but only if local attorneys could not have handled it "reasonably competently."

Therefore, based on each NCYL attorney's qualifications, on local-rates affidavits [19] submitted by the Parties,[20] and the court's knowledge of prevailing rates, the following hourly rates will apply:

Jones & Waldo

| | |
|---|---|
| M. O'Brien | $125 |
| L. Jones | $100 |
| D.J. Morgan | $90 |
| D. Kaplan | $80 |
| R. Alston | $80 |

National Center for Youth Law

| | |
|---|---|
| W. Grimm | $190 |
| M. Matthews | $130 |
| P. McElroy | $160 |
| E. Steyer | $105 |
| R. Pearl | $190 |
| Law clerks | $55 |

### 2. *Reasonable Hours Expended*

The district court must exclude from the lodestar calculation "hours that were not reasonably 'expended'" on the litigation. *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940 (citing to S.Rep. No. 94–1011, p. 6 (1976) U.S.C.C.A.N.1976, pp. 5908, 5913.). "When scrutinizing the actual hours reported, the district court should distinguish 'raw' time from 'hard' or 'billable' time to determine the number of hours reasonably expended." *Ramos,* 713 F.2d at 553. *Ramos* suggests that

the trial court ask general questions in making this assessment: (1) Was overall billing judgment exercised? (2) Was the time spent on each task reasonable? (3) Would the tasks be billed to a paying client? (4) Was non-productive time deleted? (5) Was duplicative time deleted? *See id.* at 553–55. Plaintiffs have the burden to show that hours were reasonably expended. *Mares,* 801 F.2d at 1210.

Preliminarily, it is evident that Plaintiffs' attorneys have made an effort to comply with *Ramos.* For example, they have testified that they kept contemporaneous records, exercised billing judgment at the time of a notation as well as on review, declined to bill for various intra-staff communications, have not requested compensation for approximately $2000 in photocopying expenses, and have not billed for some law clerk hours.

Defendants, however, have objected to nearly every category of time expended by Plaintiffs. The court will address these objections in turn.

### a. *Pre-Filing Work*

Defendants ask the court to find that a substantial percentage of the hours expended by Plaintiffs prior to filing the Complaint are noncompensable. Generally, they argue that no private attorney would spend so much time, that the number of hours expended go well beyond Rule 11 requirements, that time was spent on claims "not required by law," and that if Plaintiffs had filed the Complaint earlier Defendants could have attempted to control the costs.

The court disagrees. The purpose of the extensive investigation was to determine if Plaintiffs' rights truly had been violated, to attempt to settle the claims without litigation, and to discover facts to support Plaintiffs' claims once litigation began. In this regard, the court notes that investigation was difficult because the class is large, widespread, and comprised of children who often cannot speak for themselves. In addition, there is persuasive evidence that Plaintiffs'

**19.** Based on affidavits submitted, prevailing rates for excellent trial counsel experienced in civil rights litigation range from about $120 to $190 per hour. Local rates for attorneys with less experience range from about $80 to $130 per hour.

**20.** Plaintiffs have provided affidavits testifying to San Francisco prevailing rates, but have submitted very few affidavits as to local area rates for experienced civil rights litigators.

ability to gather information pre-filing may well have been easier and less expensive that it would have been post-filing. Moreover, because of the serious and controversial allegations involved in this case, Plaintiffs cannot be faulted for their efforts to abide by Rule 11 requirements and to thoroughly investigate the facts and law before making those allegations a matter of public record.[21]

### b. *Post–Filing Investigation*

■ Defendants also ask the court to deny compensation for time spent on the development of factual allegations of the Complaint after Defendants had indicated that the facts alleged in the Complaint would not be contested for the purposes of settlement.

This argument is without merit. Defendants' willingness to discuss settlement of a case is irrelevant to the matter of fees. As stated in *Cooper v. State of Utah*, 894 F.2d 1169 (10th Cir.1990), a "court's downward adjustment of fees based on settlement negotiations is not well-founded. Rule 68 Fed. R.Civ.P. provides a practical tool by which parties may protect against costs." *Id.* at 1172 (pointing out that defendants did not avail themselves of an offer of judgment). If this were not enough, the evidence before the court is persuasive that it was not unreasonable for Plaintiffs to be concerned about whether the case would settle or whether any settlement would be approved.

### c. *Time Spent With Individual Plaintiffs*

■ The court declines to adopt Defendants' position that, because the class is the prevailing party, time spent working with individual plaintiffs is noncompensable. Indeed, because of the variety of factual allegations involved in this case, contact with individual class members was generally both indispensable and inescapable. The class members—each of whom this court has jurisdiction over *as* class members—were poten-

tial witnesses and had individual federal and constitutional rights. Thus, working with individual class members was inextricably intertwined with the development of the litigation and with class relief, and is therefore compensable. *See Beard*, 31 F.3d at 954–55 (finding that work on a charge leveled at an individual class member accrued to the benefit of the class).

### d. *Public Relations, Legislative, Executive Matters*

Defendants argue that time spent by Plaintiffs on public relations work via the media, with Utah legislators and auditors, on the Child Welfare Reform Bill, and on "executive" matters, is noncompensable. Plaintiffs disagree, asserting that work that is directly related to the furthering of its goals in litigation is compensable.

#### i. *Media Time*

■ In *Utah International*, this court found that "hours spent on the public relations aspect of [a] case, *i.e.*, time spent by counsel communicating with the press and other news media" was noncompensable. *Utah International*, 643 F.Supp. at 831 n. 41; *accord, Jane L.*, 828 F.Supp. at 1550 ("Time spent by attorneys in public relations is noncompensable."); *Ramos v. Lamm*, 632 F.Supp. 376, 381 (D.Colo.1986), *on remand from, Ramos v. Lamm*, 713 F.2d 546 (10th Cir.1983) ("[T]ime spent attending speeches and press conferences must be deducted since it is not necessary to the litigation of the case.").

However, despite the broad rule expressed in *Utah International*, the court recognizes that communications directed to the class via the media, and that were directly related to this litigation, could be important given the difficulty of communicating with such a widely-spread group. In this regard, *Keyes v. School District No. 1, Denver, Colorado*, 439 F.Supp. 393 (D.Colo.1977), a class action, school desegregation lawsuit, is instructive.[22]

---

**21.** The court has examined the pre-filing itemizations prepared by Defendants and made deductions for excess and duplication. These deductions are contained in other areas discussed *infra*. To cite just a few examples, the following have been deleted: (1) meetings with Elder Pinegar, (2) meetings to discuss Utah gubernatorial candidates, and (3) research on Utah state and local judges.

**22.** The *Keyes* court found 17 of 46 hours expended in public relations compensable—those spent in lengthy community service programming which clearly and fully explained the complex issues to the class. *Keyes*, 439 F.Supp. at 408.

Although noting the difficulty that counsel had in reaching some components of the class, the *Keyes* court found that the only media time that was compensable was "those discussions with the press that contributed to communication with the class in a *meaningful* way and were necessary for the prosecution of the suit." *Id.* at 408.

This court agrees. Although communications were difficult here because the class is spread throughout the entire state, any compensation must be reserved for meaningful communications necessary to the prosecution of the suit. Therefore, the following "media" hours [23] are noncompensable and must be deleted from the award request:

| | |
|---|---|
| W. Grimm | 30.8 hours |
| M. Matthews | 2.9 hours |
| P. McElroy | 8.2 hours |
| E. Steyer | 12.4 hours |

### ii. *Legislative Matters*

 Defendants object to the inclusion of hours spent with members of the Utah legislature, legislative auditors, or for work on the Child Welfare Reform Bill ("Bill"). Plaintiffs counter that work performed in these areas was not political, but was designed to secure the relief sought in litigation. As support, Plaintiffs cite to several cases—which generally are distinguishable [24]—and also argue that obtaining increased funding was critical to the suit's success.

Although Plaintiffs' interest in the legislative audit and in the Bill is understandable, the court nevertheless does not find that all attorney hours expended in those areas are compensable. *See, e.g., Jane L.,* 828 F.Supp. at 1550 (finding that "lobbying efforts at the legislative level" are noncompensable); *Davis,* 976 F.2d at 1545, 1558 (ordering trial court to strike public relations/lobbying hours unless they involve work which only an attorney would properly do). For example, the court does not agree that lobbying is part of the litigation process. Therefore, numerous meetings and telephone conversations with legislators were more properly performed by public relations persons. In addition, there was some duplication of effort and an excessive number of hours were sometimes expended. Most important, the relief that Plaintiffs sought through the use of attorneys was litigation or settlement of the case, not the legislative audit or the Bill per se. Therefore, the court finds that the only compensable hours are those involving non-duplicative, non-excessive work related to the litigation which only an attorney would properly do, and accordingly will deduct the following hours from the requested award:

| | |
|---|---|
| W. Grimm | 24.7 hours |
| M. Matthews | 44.5 hours |
| P. McElroy | 28.2 hours |
| E. Steyer | 13.8 hours |
| D. Kaplan | 1.1 hours |
| M. O'Brien | 2.0 hours |
| K. Compton | 6.0 hours |

### iii. *Executive Matters*

Defendants also object to time spent on executive matters, which they characterize as those which generally deal with personnel decisions regarding the DHS and DFS. After consideration, Plaintiffs have deducted all

---

It refused to allow 27 hours for attendance at school board meetings, finding that this was not necessary to the proper progression of the lawsuit. *Id.* It allowed 85 of 92 proposed hours for attendance at community meetings which concerned desegregation plans and the nature of the lawsuit. *Id.* at 409.

**23.** The court has found that hours designated as "media hours" in Defendants' Response are often not well-categorized as such.

Also, deductions include both pre-filing and post-filing media time. This rule also applies to the other categories of expenses discussed *infra*.

**24.** For example, in *Jenkins v. Missouri,* 862 F.2d 677 (8th Cir.1988), although the court allowed fees incurred for activities in a school district tax levy election, it pointed out that this could not be considered "political activity." *Id.* at 678–79.

Indeed, the school district had submitted the levy increases to the voters in order to comply with a court requirement that levy increases be submitted first to the voters before the court could order a tax levy to fund desegregation. *Id.*

Also, *Davis v. City and County of San Francisco,* 976 F.2d 1536 (9th Cir.1992), does not completely support Plaintiffs' position. It is true that the court counseled deference to the trial court's determination that lobbying the San Francisco Board of Supervisors " 'was as vital to the consent decree as were the negotiations with the City's administrative officials.' " *Id.* at 1545 (citing to trial court's opinion). However, in conclusion, the court of appeals remanded the case to the district court with instructions that "fees for public relations work should be stricken unless each item can be documented as something only a lawyer appropriately should do." *Id.* at 1558.

time spent on personnel matters. *See* Plaintiffs' Reply at 45; Supplemental Affidavit of William L. Grimm at ¶ 108 (Jan. 23, 1995).

An examination of the remaining time in this category shows that it reasonably deals with the litigation and is therefore compensable.

### e. *Meetings With Local Child Advocates*

■ Defendants ask the court to refuse compensation for time spent with local child advocates. However, this argument is unpersuasive for several reasons. First, advocates were sources of information about the child welfare system and past studies or audits regarding the ·problems in · Utah. In addition, many advocates were doctors with class members as patients, teachers with class members as students, or individuals with class members living in their homes. Most important, Defendants themselves recognized the importance of these groups, specifically agreeing that "[b]efore each [negotiation] meeting ... [t]he parties will also seek input from children's advocacy groups and other concerned Utah organizations." *See* Defendants' Response at Ex. 22A, p. 3.

There is, however, some excess and duplication in this area. For example, the court declines to compensate for meetings attended by two or more attorneys when one would suffice.[25] Another small example is the excessive amount of time spent on communications regarding scheduling. The following hours will therefore be deducted:

| | |
|---|---|
| W. Grimm | 13.6 hours |
| M. Matthews | 16.1 hours |
| P. McElroy | 26.9 hours |
| E. Steyer | 40.2 hours |

### f. *Time Spent With Foster Parents*

■ Defendants also object to compensating Plaintiffs for time spent with foster parents, arguing that foster parents are not plaintiffs, that any relief provided to them was not the result of this suit, and that any relief was not required by federal law or the constitution.

Defendants' arguments are unpersuasive. As noted previously, the class here is unique. If Plaintiffs desired to obtain and disperse information about the class and class members, they usually had to speak to and through foster parents. Foster parents were also important in confirming that reported abuses were not simply isolated incidents, and in that regard would have been valuable witnesses had the case ever proceeded to trial. In addition, during settlement negotiations, foster parents were knowledgeable about the Utah system and what remedies would be most effective.

Again, however, the challenged hours include some excess, duplication, and irrelevance. One example is that Plaintiffs have failed to meet the *Ramos* requirement of justifying the presence of more than one attorney at depositions. *See Ramos,* 713 F.2d at 554 n. 4. Also, time spent by law clerks to prepare memoranda is sometimes excessive. Accordingly, the following hours are disallowed:

| | |
|---|---|
| W. Grimm | .5 hours |
| M. Matthews | 5.9 hours |
| P. McElroy | 2.5 hours |
| E. Steyer | 18.5 hours |
| D. Kaplan | 6.5 hours |
| A. Culbreath | 2.4 hours |

### g. · *Guardian Ad Litem Issues*

■ Next, Defendants challenge time spent by Plaintiffs on issues related to the Guardian Ad Litem Program ("GAL"). They assert that GAL is not a defendant here and that the Agreement does not address GAL's responsibilities. In reply, Plaintiffs have agreed to delete hours which might have related to a potential "companion" suit, but assert that all other GAL time is compensable because the individuals involved in GAL were sources of information about systemic problems in the child welfare system. They also assert that this time was essential in coordinating Plaintiffs' suit with legislative efforts to improve the GAL system.

Because GAL is inextricably intertwined with the issues in this case and because those individuals associated with GAL were an important source of information, the court finds that non-lobbying GAL time which can be categorized as informal discovery and investigation is compensable. After adjusting for duplication and excess and for hours which

---

**25.** When attendance by only one of Plaintiffs' attorneys has been allowed, compensation has been approved for the attorney with the highest hourly rate.

Plaintiffs have voluntarily deleted,[26] the following is excluded:

| | |
|---|---|
| W. Grimm | 19.3 hours |
| M. Matthews | 7.3 hours |
| P. McElroy | 19.5 hours |
| E. Steyer | 22.1 hours |

### h. *Juvenile Court Matters*

■ Defendants also object to the comparatively minuscule amount of time spent on "juvenile court matters."

This argument is rejected. Plaintiffs' uncontroverted testimony is that these hours represent time that they spent responding to Defendants' motion for a protective order that would have barred Plaintiffs' counsel from visiting their clients. This time is compensable.

### i. *Damage Cases*

■ Next, Defendants contend that time spent on what they term "damage" cases is noncompensable. However, the court has examined the records and finds, for example, that time recorded in this area was reasonably expended obtaining information on DFS practices in order to prepare the Complaint.

### j. *Time Spent With Experts*

■ In addition, Defendants object to time Plaintiffs spent working with experts. Time spent with an expert who does not testify at trial is compensable, however, so long as the time was reasonably expended in litigation of the plaintiff's case. *See Whalen v. Unit Rig., Inc.*, 974 F.2d 1248, 1254 (10th Cir.1992) (allowing compensation for statistical expert who did not testify at trial).

The court has examined the records and finds that the time spent consulting experts

as to such matters as statistical issues and mental health issues was reasonably expended. Therefore, only the following duplicative time is deducted:

| | |
|---|---|
| M. Matthews | 1.4 hours |
| P. McElroy | 1.4 hours |

### k. *Duplication of Time/Efforts at Negotiations*

■ Also at issue is Defendants' assertion that Plaintiffs were over-represented at settlement negotiations. Specifically, Defendants ask the court to delete all hours other than those recorded by Mr. Grimm, Ms. Matthews, and Mr. O'Brien.

In *Ramos*, the court of appeals specifically declined to "require an automatic reduction of reported hours to adjust for multiple representation or potential duplication." *Ramos*, 713 F.2d at 554. This refusal was prompted by the court's recognition that "utilizing more than one lawyer may be reasonable in some situations, such as during settlement conferences or during trial." *Id.* On remand, the trial court allowed compensation for multiple representation, stating that when attorneys work on different aspects of a case, "efficiency derives from organization and coordination rather than lawyers operating independently." *Ramos*, 632 F.Supp. at 383.

In this case, each side was represented by a team of attorneys and professionals. Defendants have not denied that they were represented at each meeting by three attorneys and three DHS officials. *See* Plaintiffs' Reply at p. 34; *see also*, Defendants' Response at p. 9 ("Defendants were at all times represented by two assistant attorneys general and the Solicitor General."). Plaintiffs were represented at each meeting by three to six attorneys.[27]

---

**26.** There is some ambiguity as to exactly which hours Plaintiffs have voluntarily deleted. *See* Supplemental Declaration of Martha Matthews, Ex. 6 (Jan. 20, 1995) (compare pp. 62–63 with p. 61). Therefore, Plaintiffs must assume the risk that the court has deducted for some items which Plaintiffs have already withdrawn.

**27.** Time records indicate that Plaintiffs' counsel at each meeting was as follows:

| | |
|---|---|
| Apr. 27, 1993 | Grimm, Matthews, McElroy, O'Brien |
| May 18, 1993 | Grimm, Matthews, McElroy, O'Brien |
| June 9, 1993 | Grimm, Matthews, McElroy, O'Brien |
| July 8, 1993 | Grimm, Matthews, McElroy, O'Brien |
| Nov. 19, 1993 | Grimm, Matthews, Steyer, O'Brien |
| Jan. 7, 1994 | Grimm, Matthews, McElroy, Steyer, O'Brien, Kaplan |
| Mar. 22, 1994 | Grimm, Matthews, McElroy, Steyer, O'Brien |
| Apr. 1, 1994 | Matthews, McElroy, Morgan |
| Apr. 25, 1994 | Grimm, Matthews, McElroy, Steyer, O'Brien, Morgan |

The court has carefully examined the course of this litigation and the apparent interplay of work assignments, and is persuaded that five of Plaintiffs' counsel formed a core negotiating team, each having specific expertise and responsibilities. Each of these individuals was a major player and appears to have worked on a different aspect of the case. As such, each of the five was reasonably necessary to achieve what Defendants concede was an excellent agreement which resolved all claims. Moreover, it is uncontroverted that Ms. McElroy was responsible for and drafted four sections of the Agreement.

However, Plaintiffs have not made it clear why the presence of Mr. Kaplan on January 7, 1993 and Mr. Morgan on April 25, 1994 were reasonably necessary to the negotiations. *Ramos* instructs that "[n]o fees should be awarded for hours reported by lawyers ... who are present at depositions, hearings, or trial for the purpose of being trained and who do not participate in or contribute to the proceedings." *Ramos,* 713 F.2d at 554 n. 4. Therefore, the following hours are deducted:

| | |
|---|---|
| D. Kaplan | 3.6 |
| D.J. Morgan | 2.5 |

### 1. *Travel Time & Expenses*

■ Preliminarily, because the court has found that there is insufficient evidence in the record to support the need for out-of-area counsel, Plaintiffs' airline expenses for travel between Utah and Oakland/San Francisco ("California") will not be compensated. *See Ramos,* 713 F.2d at 559 (stating that when out-of-area counsel is unnecessary, "travel expenses for such counsel between their offices and the city in which the litigation is conducted should [not] be reimbursed").

In addition, Defendants argue that travel time in which Plaintiffs' records fail to indicate that work is being performed is noncompensable. This includes at least 1.5 hours of the 3 hours that Plaintiffs generally recorded as travel time between California and Utah. Furthermore, the issue arises as to whether airplane travel time in which counsel *was* working is compensable and to what degree. Similarly, if an attorney found it necessary to drive to an outlying area of Utah for some-

thing related to this litigation, is that time fully compensable?

"[U]nless it is demonstrated that work was performed during time spent traveling, that time is generally not compensable." *Ramos,* 632 F.Supp. at 381. If it can be shown that work on the case was performed while traveling, the hours are properly included. *Id.* at 384. However, as noted in *Jane L.,* travel time is essentially unproductive and should be compensated at a reduced hourly rate. *Jane L.,* 828 F.Supp. at 1549; *accord, Keyes,* 439 F.Supp. at 409 (compensating at below the normal rate in consideration of "lessened legal efficiency"). In *Keyes,* for example, the trial court compensated at 50% of normal rate for work done while in flight. *Id.* Likewise, in *Smith v. Freeman,* 921 F.2d 1120 (10th Cir.1990), the court found "no abuse of discretion in the trial court's determination that an attorney's driving time, while necessary, is essentially unproductive and, therefore, compensable at a reduced hourly rate." *Id.* at 1122 (allowing compensation at 25% of normal rate for driving time).

Because the court has declined to compensate at out-of-area-rates, it finds that all nonworking hours recorded between California and Utah are noncompensable. Furthermore, the court finds that work performed during travel results in "lessened legal efficiency" and should be compensated at a reduced hourly rate. Therefore, in the exercise of its discretion, when records indicate that attorneys were working during these "unnecessary" airplane flights, compensation will be 50% of normal. Necessary time spent driving within Utah will also be compensated at 50% of the normal rate. The following deductions are therefore made: [28]

#### Travel Hours

| | |
|---|---|
| W. Grimm | 163.45 hours |
| M. Matthews | 67.75 hours |
| P. McElroy | 193.35 hours |
| E. Steyer | 134.30 hours |

#### Travel Expenses

$41,461.65

---

**28.** Hours have been adjusted to reflect percentage deductions.

#### m. *Miscellaneous Deductions*

Finally, Defendants take issue with "miscellaneous" time and expenses. These expenditures have been reviewed and it is apparent that the bulk of the time and expenses claimed were expended on the litigation and are not excessive or duplicative. Only the following hours are deducted as being excessive or not reasonably expended on the litigation: [29]

| | |
|---|---|
| W. Grimm | .5 |
| E. Steyer | .6 |
| K. Stark | 31.0 |
| A. Culbreath | 5.0 |

#### C. Adjustments to the Lodestar

 Apparently premised on the *Nadeau* prevailing party test, Defendants also devote a major portion of their Response to an argument requesting a reduction [30] in attorney's fees because:

> Plaintiffs are only entitled to fees for work related to those portions of the Settlement Agreement that include relief that would have otherwise been required by federal law. In other words, not only must a

Plaintiff be a prevailing party to recover attorney's fees under Section 1988, but a Plaintiff must also prevail on issues which are required by law. Even though the Settlement Agreement encompasses important reforms in child welfare, a significant portion of the action taken by the State in response to the lawsuit was not required by law.

Defendants' Response at pp. 37–38 (emphasis deleted). As support, Defendants cite to *Nadeau, J & J Anderson, Supre,* and *Griffin.* However, these cases neither make nor support this argument, and the court has been unable to locate a case that does.

Defendants apparently misapprehend the *Nadeau* test and the cases which have applied it.[31] *See supra,* Part II(A) (discussing *Nadeau* test). That test is one to determine, in the absence of a judicial determination on the merits, whether a party is prevailing. The "required by law" [32] prong of the test is merely the second step in determining whether a plaintiff *is* prevailing so as to be eligible for a § 1988 fee award. Once a

---

**29.** Deductions for Mr. Grimm's travel time between the District of Columbia and Salt Lake City on 7–6–93 and 7–9–93 are included in subpart 1 *supra.*

**30.** It is unclear to the court what type of reduction Defendants suggest. Presumably, it would be a percentage deduction based on Defendants' argument that only two of the six causes of action were "required by law."

It is also unclear whether Defendants intend this to be an argument subsumed under "prevailing party," "reasonable hours," or "adjustment to lodestar." Because it appears that this is more properly an "adjustment to lodestar" argument, it will be treated as such.

**31.** *Griffin* is not discussed because it does not examine whether a defendant's conduct was required by law and does not rely on the *Nadeau* "required by law" prevailing party test. Moreover, the 50% reduction in the lodestar in *Griffin* was due to plaintiffs' failure to prevail on all claims and because, even though these claims were sufficiently related to successful claims, the level of success achieved did not make the hours expended reasonable. *See Griffin,* 827 F.Supp. at 688 (relying on *Hensley* test discussed *infra* ).

**32.** Plaintiffs argue that the second, "required by law," prong of this test does not require, as Defendants assert, that Plaintiffs must prove that they would have prevailed on a motion to dismiss. *See* Plaintiffs' Reply at p. 53–54; *see also* Defendants' Response at p. 39. Plaintiffs contend that to satisfy this prong, Plaintiffs need only show that "the defendant's agreement to settle was not a 'wholly gratuitous response' to a 'frivolous or groundless' claim." Plaintiffs' Reply at p. 53 (emphasis omitted) (stating second prong test as " 'the defendant's conduct was required by law, *i.e.,* not a wholly gratuitous response to an action that in itself was frivolous or groundless.' ") (quoting *Beard,* 31 F.3d at 952 (citing *J & J Anderson,* 767 F.2d at 1475)).

Although Plaintiffs' argument is not relevant to the court's analysis here, the Tenth Circuit has recently addressed whatever tension that might exist between the "required by law" and "wholly gratuitous response" language. *See Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Social and Rehab. Servs.,* 31 F.3d 1052 (10th Cir.1994). Referring to the "frivolous and groundless" language, the court stated that:

> the plaintiffs conclude that the "required by law" prong of the catalyst test is, in essence, a showing that the defendants' response was necessarily to an action that in itself was frivolous or groundless. We disagree with the plaintiffs' reading.... The essential part of that language is "that the defendants' conduct was *required by law.*" The court's reference to "a wholly gratuitous response to an action that in itself was frivolous or groundless" is obviously intended as only one example of the type of conduct referred to by the court.

*Id.* at 1055 (citing to *Supre,* 792 F.2d at 964 (quoting *J & J Anderson,* 767 F.2d at 1475)).

party is found to be prevailing, by whatever degree, the threshold requirement has been met and the next issue is what amount of award is reasonable. The "required by law" prong and language serve no other purpose.[33]

For example, *J & J Anderson* consists primarily of an examination of each claim asserted to determine if *any one* of them might meet the required by law prong of the *Nadeau* test so as to allow plaintiff to *become* a prevailing party. *See J & J Anderson,* 767 F.2d at 1474–78. Similarly, the sole issue in *Supre* was whether the plaintiff was a prevailing party under the *Nadeau* test. *See Supre,* 792 F.2d at 962–63 (concluding that plaintiff was not a prevailing party because she could not meet the required by law prong).

It is true, however, that once a plaintiff meets the required by law prong and becomes a prevailing party, the trial court may make adjustments to the lodestar for results obtained. "This factor is particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief."[34] *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940. When this occurs, two questions are asked: "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" *Id.* In applying this test, when there is a common core of facts and results have been excellent, "no reduction should be made because plaintiff failed to prevail on every contention." *Ramos,* 713 F.2d at 556.

■■■■ *Hensley* states several rules. First, when a prevailing party does not succeed on all claims, and the unsuccessful claims are based on different facts and different legal theories, work on the unsuccessful

claims "cannot be deemed to have been 'expended in pursuit of the ultimate result achieved.'" *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940 (citations omitted). Therefore, no award will be made for the unsuccessful claim. *Id.* Second, when a prevailing party does not succeed on all claims, but the unsuccessful claims are based on a common core of facts or related legal theories, the focus should be "on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* Thus,

> [w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.... In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.

*Id.* (citations omitted). Third, even though unsuccessful claims are related and raised in good faith, if the prevailing plaintiff has achieved only limited success, a reduction is in order. *Id.* at 436, 103 S.Ct. at 1941.

Applying *Hensley* to this case reveals several problems. First, Plaintiffs have not achieved mere "limited success on the merits." Defendants readily agree that the Agreement "resolved all of the claims brought by Plaintiffs in this action." Defendants' Response at p. 41. Second, even if Plaintiffs had been unsuccessful on some claims, Defendants make no argument that these would not have involved related legal theories or a common core of facts. Third, the admittedly excellent level of success

---

**33.** If this court were to apply the standard Defendants suggest, it would be necessary to examine each separate claim in each case, determine whether Defendants' response was required by law so that Plaintiffs were a prevailing party on that one claim, and then award attorney's fees on that claim. This is clearly at odds with the Supreme Court's admonition that "[a] request for attorney's fees should not result in a second major litigation." *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941. It is also at odds with *Hensley* 's lesson: even though a party does not prevail on

all claims, so long as results are excellent and those claims rest on related legal theories or a common core of facts, there should be full compensation. *Id.* at 435, 103 S.Ct. at 1940. In other words, "[t]he result is what matters." *Id.*

**34.** This appears to be similar to what Defendants are arguing, *i.e.,* that lodestar adjustments should be made to reflect the fact that Defendants chose to give Plaintiffs more in the Agreement than they might have received in an adjudication on the merits.

strongly suggests that the hours that Plaintiffs expended are a satisfactory basis for making this fee award.

In short, the court cannot reconcile Defendants' argument with the purpose of the "required by law" test, with the facts, with the Settlement, and with *Hensley.* Accordingly, no reduction in the lodestar based on Defendants' "required by law" argument will be made.

### D. Fee Application

 Finally, Defendants ask the court to reduce by 25% the amount which Plaintiffs request for preparation of the fee petition.[35] As support, they point to *Griffin,* in which the court ordered a 50% reduction in that area. *See Griffin,* 827 F.Supp. at 687.

This court has previously found that "hours reasonably spent in establishing an entitlement to fees are compensable." *Utah International,* 643 F.Supp. at 831 (citing *Hernandez v. George,* 793 F.2d 264, 269 (10th Cir.1986)). There is an exception to this:

> Where petitioners, however, are successful in recovering only a fraction of the fee award originally sought, we do not believe they are entitled to an award for all of the time spent prosecuting the fee petition. Any award for time spent in pursuing motions for fees must not be excessive in relation to the award obtained.... We ... will calculate petitioners' fee awards ... by allowing them the percentage of their [fee award] request that correlates with the percentage of the total fee request ultimately awarded on the other phases.

*Id.*

This exception does not apply here. A close reading of *Utah International* shows that reductions in the fee petition area were reflective of the fact that there was only a limited portion of the case in which petitioners were both successful as plaintiffs, not as defendants, and not aligned with the United States government.[36] *Id.* at 827 (emphasis deleted). Similarly, the 50% reduction in *Griffin* is consistent with the court's 50%

decrease in the lodestar to reflect plaintiff's limited overall success in the litigation. *See Griffin,* 827 F.Supp. at 688.

In contrast, this court has declined to make downward adjustments to the lodestar based on Defendants' "required by law" argument. There is therefore no justification for an arbitrary 25% reduction and Plaintiffs will be fully compensated for time spent preparing the fee application.

### E. Costs and Expenses

Plaintiffs also request reimbursement for "out-of-pocket" expenses incurred in this litigation. Defendants have made no explicit, specific objection to these. Whether these are proper is dependent on "whether they are properly characterized as fees awarded pursuant to section 1988, or whether they are costs governed by 28 U.S.C. § 1920 (1988) and Fed.R.Civ.P. 54(d)." *Bee v. Greaves,* 910 F.2d 686, 690 (10th Cir.1990).

### 1. Costs

 "[C]osts shall be allowed as of course to the prevailing party unless the court otherwise directs." Fed.R.Civ.P. 54(d). The following items may be taxed as costs: (1) fees of the clerk and marshal; (2) court reporter fees for any part of the stenographic transcript "necessarily obtained for use in the case"; (3) "[f]ees and disbursements for printing and witnesses"; (4) "[f]ees for exemplification and copies of papers necessarily obtained for use in the case"; (5) docket fees under 28 U.S.C. § 1923; and (6) compensation of court appointed experts, interpreters, and "salaries, fees, expenses and costs for special interpretation services" under 28 U.S.C. § 1828. *See* 28 U.S.C. § 1920.

An examination of the Jones & Waldo part of the petition shows a request of $25.50 associated with a transcript, and request of $15 for a filing fee. These are properly recoverable.

### 2. Expenses

 Expenses, on the other hand, are "[i]tems that are normally itemized and billed in addition to the hourly rate." *Ramos,* 713

---

**35.** Defendants also objected to Mr. Pearl's hourly rate of $310. However, Mr. Pearl's rate has previously been reduced to $190, and that issue will not be discussed.

**36.** Even if the United States "prevails," it cannot recover a fee award. *See* 42 U.S.C. § 1988.

F.2d at 559. These "should be included in fee allowances in civil rights cases if reasonable in amount." *Id.* However, "these kinds of expenses should be allowed as fees only if such expenses are usually charged separately in the area." *Id.*

▮ Jones & Waldo has requested $7323.65 for expenses related to such items as postage, photocopying, courier service, computer research, telephone tolls, and office supplies. There is uncontroverted testimony that it is the practice in Salt Lake City to charge separately for these items. After examination, the court finds that the requested amount is reasonable and compensable.

An examination has also been made of the expenses claimed by the NCYL. The sum of $2000 which has been requested as reimbursement for a transcript of the proceedings in the jury trial *State v. Blaine R. & Mary MacKay* will be disallowed. There is insufficient evidence in the record as to why this transcript was necessary to this litigation.

Other expenses claimed by the NCYL are those for such typical expense items as fax costs, federal express service, and telephone tolls.[37] These are compensable.

In sum, the court finds that the following expenses are reimbursable:

Jones & Waldo
$7323.65

NCYL
Federal Express Messenger

| | |
|---|---|
| or Fax | $2287.65 |
| Telephone | $7896.30 |
| Miscellaneous | $206.73 |
| Law Offices of Richard Pearl | $256.62 |
| Total NCYL | $10,647.30 |
| Total Reimbursable Expenses | $17,970.95 |

## III. *ORDER*

For the foregoing reasons, and good cause appearing, IT IS HEREBY ORDERED as follows:

Pursuant to 42 U.S.C § 1988, and in the exercise of this court's discretion, Plaintiffs are entitled to an award of $624,044.20 for attorney's fees, expenses, and costs associated with this action.[38]

---

**37.** The court realizes that its allowance of telephone toll expenses may seem inconsistent with its finding that travel expenses between California and Utah are noncompensable. Nevertheless, it cannot reasonably be said that these calls were unnecessary.

**38.** *See* Appendix for a summary of costs and expenses.

<u>APPENDIX</u>

SUMMARY OF ATTORNEY'S FEES AWARD

| LAW FIRM/ATTORNEY | HOURS | RATE | AWARD |
|---|---|---|---|
| <u>Jones, Waldo, Holbrook & McDonough</u> | | | |
| Michael P. O'Brien | 286.70 | $125 | $ 35,837.50 |
| Lisa A. Jones | 12.57 | 100 | 1,257.00 |
| D. James Morgan | 42.30 | 90 | 3,807.00 |
| Daniel A. Kaplan | 186.30 | 80 | 14,904.00 |
| Rob M. Alston | 20.50 | 80 | 1,640.00 |
| | | | |
| <u>National Center for Youth Law</u> | | | |
| William Grimm | 991.95 | $190 | $188,470.50 |
| Martha Matthews | 544.75 | 130 | 70,817.50 |
| Patrice McElroy | 1193.45 | 160 | 190,952.00 |
| E.B. Steyer | 503.10 | 105 | 52,825.50 |
| | | | |
| Law Clerks: | | | |
| Adam Culbreath | 151.50 | $ 55 | $ 8,332.50 |
| Karen Stark | 164.05 | 55 | 9,022.75 |
| Karen Compton | 48.00 | 55 | 2,640.00 |
| | | | |
| <u>Law Offices of Richard M. Pearl</u> | | | |
| Richard M. Pearl | 134.35 | 190 | $ 25,526.50 |

**TOTAL FEES INCURRED** $606,032.75

<u>COSTS AND EXPENSES</u>

| | | |
|---|---|---|
| <u>Jones, Waldo, Holbrook & McDonough</u> | | |
| Costs | $ | 40.50 |
| Expenses | | 7,323.65 |
| <u>National Center for Youth Law</u> | | |
| Travel | | 0 |
| Federal Express Messenger and/or FAX | $ | 2,287.65 |
| Telephone | | 7,896.30 |
| Miscellaneous | | 206.73 |
| <u>Law Offices of Richard Pearl</u> | | |
| Expenses | $ | 256.62 |

**TOTAL COSTS AND EXPENSES** $ 18,011.45